107 F.3d 403
 65 USLW 2588
 DLS, INC., d/b/a Diamonds and Lace Showbar, a Tennessee
corporation; Ann Martin; Kim Tyndall; and Karen
Chadwick, Plaintiffs-Appellants,
v.
CITY OF CHATTANOOGA; City Council of Chattanooga,
Tennessee; Mayor Gene Roberts; Chairman Don Eaves;
Councilpersons Mai Bell Hurley, David Crockett, David
Distefano, Yusef Hakeem, John Lively, Leamon Pierce, Marti
Rutherford, Ron Swafford; and Chief of Police Ralph
Cothran, Defendants-Appellees.
 No. 95-5971.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 7, 1996.
Decided Feb. 20, 1997.
Rehearing and Suggestion for Rehearing
En Banc Denied April 15, 1997.
 
 Jerry H. Summers (argued and briefed), Jimmy F. Rodgers, Jr., Summers, McCrea & Wyatt, Chattanooga, TN, for Plaintiffs-Appellants.
 William S. Parker, Jr., Philip A. Noblett (argued and briefed), Nelson, McMahan, Parker & Noblett, Chattanooga, TN, for Defendants-Appellees.
 Before: LIVELY, BOGGS, and NORRIS, Circuit Judges.
 BOGGS, Circuit Judge.
 
 
 1
 The plaintiffs below--a corporation operating a nightclub devoted to erotic dancing, the corporation's sole shareholder, and two of its employees--brought suit under 42 U.S.C. § 1983 to challenge the constitutionality of the City of Chattanooga's ordinance that regulates such facilities. After a bench trial, the district court enjoined the City from enforcing portions of its licensing system, but upheld the ordinance in all other respects. The plaintiffs appeal from that judgment, and we affirm.
 
 I. The History of the Ordinance
 
 2
 In 1986, the Chattanooga Board of Commissioners enacted an ordinance to regulate "adult-oriented establishments," which were defined to include, inter alia, both "adult cabarets," or public facilities that feature employees who expose their breasts, buttocks, or genitals to public view, and "adult bookstores," or bookstores that also offer films or live entertainment that depict certain defined "sexual activities" or "anatomical areas." Chattanooga, Tenn., Ordinance No. 8601 § 2 (Mar. 4, 1986), codified at Chattanooga, Tenn., City Code § 11-422. The City made a number of legislative findings, most of which referred to the health risks inherent in the sexual activities that it believed to be commonplace in adult bookstores within Chattanooga. However, it did not limit its findings to adult bookstores, but instead found that all adult-oriented establishments posed health risks, and that such facilities "create[ ] conditions that generate prostitution and other crimes." Ordinance No. 8601 § 1(a)(2). Accordingly, the ordinance established a regulatory system applicable to both adult bookstores and adult cabarets. It required such facilities to be licensed by the City, id. § 3, and employees of such facilities to obtain permits from the City, id. § 6. It also imposed a series of other obligations on adult-oriented establishments, including a ban on "sexual intercourse or oral or anal copulation or other contact stimulation of the genitalia," id. § 15(a), and a ban on the touching or exposure of certain defined parts of the body, id. § 15(b)-(c).
 
 
 3
 After the enactment of the ordinance, several proprietors of adult-oriented establishments brought suit to challenge it on First Amendment grounds. Judge R. Allan Edgar of the United States District Court for the Eastern District of Tennessee upheld most of the ordinance. Broadway Books, Inc. v. Roberts, 642 F.Supp. 486, 490-94 (E.D.Tenn.1986). Judge Edgar applied Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), to hold that the ordinance was directed to the content-neutral goals of the prevention of crime and disease, and that most of the ordinance's provisions were narrowly tailored. However, Judge Edgar found that the City had failed to provide a sufficient rationale for the requirements that a licensee be a resident of Chattanooga, see Ordinance No. 8601 § 5(a)(1)(iii), (2)(iii), (3)(iii), and be "of good moral character and reputation in the community in which he or she resides," id. §§ 4(15), 5(a)(1)(i), (2)(i), 3(i), and enjoined the City from enforcing those provisions. Broadway Books, 642 F.Supp. at 494-95. The City responded to the district court's order by amending the ordinance to strike the offending requirements for licensees, and also to strike the corresponding requirements for permit holders. Ordinance No. 8838 (Sept. 8, 1987).[1]
 
 
 4
 In 1995, the City Council enacted an amendment to the ordinance, which sparked the litigation before us. The amendment changed the ordinance in four respects. First, it revised the definition of "adult cabaret" to mean
 
 
 5
 an establishment which features as a principle [sic] use of its business, entertainers and/or waiters and/or bartenders who expose to public view of the patrons within said establishment, at any time, the bare female breast below a point immediately above the top of the areola, human genitals, pubic region, or buttocks, even if partially covered by opaque material or completely covered by translucent material; including swim suits, lingerie or latex covering. Adult cabarets shall include commercial establishments which feature entertainment of an erotic nature including exotic dancers, strippers, male or female impersonators, or similar entertainers.
 
 
 6
 Chattanooga, Tenn., Ordinance No. 10178 § 1 (Mar. 7, 1995), codified at Chattanooga, Tenn., City Code § 11-422(e). Second, whereas the ordinance originally only required entertainers to obtain permits, the amendment expanded that requirement to all employees of adult-oriented establishments. Ordinance No. 10178 § 2 (Mar. 7, 1995), codified at Chattanooga, Tenn., City Code § 11-426. Third, the amendment revised the wording of the ban on sexual intercourse. Ordinance No. 10178 § 3 (Mar. 7, 1995), codified at Chattanooga, Tenn., City Code § 11-435(a). Finally, and most importantly for this appeal, the amendment added a new provision:
 
 
 7
 No entertainer, employee or customer shall be permitted to have any physical contact with any other [sic] on the premises during any performance and all performances shall only occur upon a stage at least eighteen inches (18"') above the immediate floor level and removed at least six feet (6') from the nearest entertainer, employee and/or customer.
 
 
 8
 Ordinance No. 10178 § 4 (Mar. 7, 1995), codified at Chattanooga, Tenn., City Code § 11-435(d).II. The Proceedings Below
 
 
 9
 Shortly after the amendment was enacted, the plaintiffs filed a complaint in the United States District Court for the Eastern District of Tennessee challenging the constitutionality of the ordinance in its entirety. Judge Edgar was assigned again to hear the case. On July 12, 1995, following a five-day bench trial, the district court again upheld the ordinance in most respects, finding that the ordinance was directed to content-neutral purposes and that most of the provisions were narrowly tailored. DLS, Inc. v. City of Chattanooga, 894 F.Supp. 1140, 1145-47 (E.D.Tenn.1995). However, the court held that the license and permit procedures established by the ordinance were unconstitutional in four particulars. These were: (1) a disclosure requirement for all persons who hold more than 5% of a licensee's stock, Chattanooga, Tenn., City Code § 11-424(b); (2) the failure to include a mechanism for judicial review for denials of permits, id. § 11-428; (3) the failure to provide for judicial review of, or any time limits on, the consideration of applications to renew licenses or permits, id. § 11-431; and (4) the failure to provide for judicial review of, or for maintenance of the status quo pending the resolution of, proceedings to revoke a license or a permit, id. § 11-432. Accordingly, the district court enjoined the City from enforcing those provisions. DLS, 894 F.Supp. at 1147-49.
 
 
 10
 On July 19, 1995, the plaintiffs filed a notice of appeal from the judgment of July 12. The defendants did not cross-appeal. Subsequently, the City Council amended the ordinance to limit the disclosure requirements to majority shareholders, to provide for judicial review and decisional time limits in all proceedings, and to provide for maintenance of the status quo in revocation proceedings. Chattanooga, Tenn., Ordinance No. 10270 (Aug. 1, 1995). The defendants filed a motion to dissolve the injunction, which the plaintiffs did not oppose. The district court granted that motion on September 5, 1995. The plaintiffs have not appealed from that order.
 
 
 11
 Two of the plaintiffs in this case--DLS, Inc., and Ann Martin, its sole shareholder--and two other employees of DLS have filed a separate suit against the City to challenge the constitutionality of Tennessee's anti-nudity law, Tenn.Code § 39-13-511, the City's ordinance barring public nudity, Chattanooga, Tenn., City Code § 25-85, and the portion of the adult-oriented establishment ordinance that bars the exposure of the breasts, buttocks, or sex organs "with the intent to arouse or gratify the sexual desires of the operator, entertainer, employee, or customer." Chattanooga, Tenn., City Code § 11-435(c). The district court--again, Judge Edgar--granted the plaintiffs a preliminary injunction against the enforcement of the last-named enactment. DLS, Inc. v. City of Chattanooga, 914 F.Supp. 193, 197 (E.D.Tenn.1995). That case was then transferred by the Judicial Panel on Multidistrict Litigation to the Middle District of Tennessee for consolidation with a series of other suits that challenged the constitutionality of the Tennessee statute. After that transfer, Judge Robert Echols dismissed the complaint in its entirety. In re Tennessee Public Nudity Statute Litig., MDL No. 1031, slip op. at 41-46 (M.D.Tenn. Sept. 30, 1996). Only Judge Edgar's 1995 judgment is before us in this appeal, and we do not consider the merits of plaintiffs' other lawsuit.
 
 III. Issues on Appeal
 
 12
 The complicated nature of the proceedings below and of the arguments before us have rendered it necessary for us to clarify the issues that we consider to be properly before this court for decision. The plaintiffs purported to challenge the ordinance in its entirety in their complaint, and at several points reiterated that intent to the district court. However, with the exception of a few specific provisions, the plaintiffs provided only conclusory statements to the district court in their trial brief, post-trial brief, and various motions. As the district court put it,
 
 
 13
 Plaintiffs, in shotgun fashion, have challenged virtually every paragraph, jot, and title [sic: tittle] of the Ordinance as being either vague, overbroad, subject to unbridled discretion, or some other constitutional infirmity. Several of the provisions about which the plaintiffs complained have previously been upheld by this Court. Plaintiffs have presented nothing that warrants revisiting these determinations.
 
 
 14
 DLS, 894 F.Supp. at 1147, citing Broadway Books, 642 F.Supp. at 492-94.
 
 
 15
 Plaintiffs have continued the shotgun approach on appeal, firing conclusory arguments haphazardly, in the hope that some part of the ordinance may be crippled. While plaintiffs' counsel stated at oral argument that plaintiffs wished to challenge the entire ordinance, they confined their attack before us to the manner in which the most recent amendment was enacted.[2] Since their brief was not entirely clear as to which portions of the ordinance they wished to attack, we will direct our remarks to those portions of the ordinance that the district court considered to be before it for review. See Foster v. Barilow, 6 F.3d 405, 407 (6th Cir.1993). Those portions divide into two categories: first, the six-foot buffer zone requirement of § 11-435(d), and second, those portions of the licensing procedures that the plaintiffs challenged unsuccessfully before the district court--the procedural mechanisms for the issuance of licenses under §§ 11-424 and 11-425, and the substantive standards for the issuance of licenses or permits under §§ 11-425 and 11-428. We discuss each category in turn.
 
 IV. The Six-Foot Buffer Zone
 
 16
 As described above, the ordinance as amended prohibits entertainers from approaching within six feet of customers, employees, or other entertainers during a performance, and requires all such performances to occur on a stage that is at least eighteen inches high. The plaintiffs argue that the requirement of a six-foot buffer zone does not satisfy the First Amendment test laid out in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).[3] Before we review that argument, however, we must address the defendants' contention that speech is not implicated here at all.
 
 
 17
 The defendants argued both before this court and before the district court that the erotic dancing at issue here does not qualify as speech at all, citing dicta in City of Dallas v. Stanglin, 490 U.S. 19, 25, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989): "It is possible to find some kernel of expression in almost every activity a person undertakes--for example, walking down the street or meeting one's friends at a shopping mall--but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." The defendants argued that an admission by one of the dancers at the Diamonds and Lace Showbar that she did not believe that she was expressing any sort of message in her dances brings those dances within the reach of those activities considered to be non-expressive in Stanglin. The district court expressed its doubt that the dances were speech, but believed that Barnes v. Glen Theatre, Inc., 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), required a holding that erotic dancing is expressive activity as a matter of law. DLS, 894 F.Supp. at 1144-45.
 
 
 18
 We read Barnes differently. Justice Souter argued in his concurring opinion--which, as the opinion concurring in the judgment on the narrowest grounds, is binding on this court, see Triplett Grille, Inc. v. City of Akron, 40 F.3d 129, 134 (6th Cir.1994)[4]that the dances at issue in that case were expressive. However, he based that argument on a review of the record before him in that case:
 
 
 19
 But dancing as a performance directed to an actual or hypothetical audience gives expression at least to generalized emotion or feeling, and where the dancer is nude or nearly so the feeling expressed, in the absence of some contrary clue, is eroticism, carrying an endorsement of erotic experience. Such is the expressive content of the dances described in the record.
 
 
 20
 Barnes, 501 U.S. at 581, 111 S.Ct. at 2468 (Souter, J., concurring in the judgment) (emphasis added). We read Justice Souter's opinion not to state that all similar activities are speech as a matter of law, but instead to leave open the possibility that, on a different record, some activities may be considered not to be expressive at all. We consider it appropriate to determine whether speech is implicated on a case-by-case basis as a question of fact, given the broad range of activities that may be governed by this ordinance or laws similar to it. At one extreme, such laws might prohibit a performance of the Dance of the Seven Veils in Strauss's Salome, "everyone's favorite example of constitutionally protected striptease." Miller v. Civil City of South Bend, 904 F.2d 1081, 1094 (7th Cir.1990) (en banc) (Posner, J., concurring), rev'd sub nom. Barnes v. Glen Theatre, Inc., 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). At the other extreme, such laws--including this one, see Chattanooga City Code § 11-435(a)--might prohibit activities that are indistinguishable from prostitution, which cannot seriously be said to involve more than the "kernel" of expression found to be insufficient in Stanglin.
 
 
 21
 We also consider it appropriate to define carefully the expressive activity that is at issue in a particular case because much of First Amendment analysis turns on that definition; for example, it is helpful to have a clear idea of what speech is at issue in order to resolve the question of whether a law restricts more of that speech than necessary. See D.G. Restaurant Corp. v. City of Myrtle Beach, 953 F.2d 140, 145 (4th Cir.1991) ("It would seem quite difficult for D.G. Restaurant to demonstrate that the city's focus ... was the eradication of the message conveyed by nude dancing, when the proponent of the dancing, itself, is unable to describe the nature of the message which the city's regulation is alleged to have targeted."). Therefore, if we were inclined to reverse the district court, we would remand with a suggestion that a record should be developed on this issue.[5] As we demonstrate below, however, we are not so inclined. We proceed under Justice Souter's understanding--concededly, on a different record--that the message involved here is "an endorsement of erotic experience."In Barnes, Justice Souter endorsed the plurality's application of the O'Brien test to judge the validity of Indiana's public-nudity statute. See Barnes, 501 U.S. at 566, 111 S.Ct. at 2460 (plurality opinion); id. at 582, 111 S.Ct. at 2468-69 (Souter, J., concurring in the judgment).[6] We therefore consider the validity of the Chattanooga ordinance under the same four-part test:
 
 
 22
 a government regulation is sufficiently justified if it is within the constitutional power of government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedom is no greater than is essential to the furtherance of that interest.
 
 
 23
 O'Brien, 391 U.S. at 377, 88 S.Ct. at 1679. Because the constitutional power of the Chattanooga City Council to enact this ordinance is not at issue, we consider the remaining three factors in order.
 
 
 24
 With respect to the second part of the O'Brien test, the defendants assert, and the district court found, that the requirement of a six-foot buffer zone furthers the important state interests of the prevention of crime and the prevention of disease. The plaintiffs appear to concede that these interests would be sufficiently important to justify a content-neutral restriction on speech. This concession is wise, as courts have repeatedly found the prevention of crime and disease to satisfy this part of the O'Brien test. See Barnes, 501 U.S. at 582, 111 S.Ct. at 2468-69 (Souter, J., concurring in the judgment); Renton, 475 U.S. at 48, 106 S.Ct. at 929; Triplett Grille, 40 F.3d at 134.
 
 
 25
 The plaintiffs argue, however, that the six-foot rule does not further those interests. They claim that there is no evidence that "adult cabarets," as opposed to "adult bookstores," are associated with crime or health problems. They are incorrect. First, crime: Ann Martin, the sole shareholder of DLS, operated another adult cabaret in Chattanooga known as the "Classic Cat" in the late 1970's and early 1980's. Police records reveal that, in 1979 and 1980, police were called to the Classic Cat a total of 435 times; the records include reports of rape, aggravated assault with weapon, prostitution, contributing to the delinquency of a minor, and one report of lunacy. In addition, there are contemporaneous reports of serious crimes at other adult cabarets in Chattanooga, including prostitution at "Night Haven," and sexual exploitation of a minor at "Club Do-Do."
 
 
 26
 Second, health: seven members of the Chattanooga Police Department testified that they have visited the Diamonds and Lace Showbar and other adult cabarets in the city repeatedly in what each officer described as an on-going undercover investigation. Each officer testified that he has witnessed, or personally been subjected to, violations of the old ordinance's prohibition on contact between entertainers and customers; commonly, such contact occurs in one-on-one "couch dances" in an area separated from the main performing stages. An officer of the Chattanooga Health Department testified that such contact poses a risk of the transmission of disease. Furthermore, particular dances described in the record--such as one instance in which a dancer invited customers to spoon-feed themselves whipped cream off of her breasts, buttocks, and vaginal area--pose a particularly acute risk of the transmission of disease.
 
 
 27
 The plaintiffs object that much of the evidence of crime and health effects was developed after the enactment of the 1995 amendment to the ordinance, and therefore is not evidence of the City Council's intent. They cite Sixth Circuit authority to the effect that the government must show that the legislature actually relied on evidence of secondary effects. See Christy v. City of Ann Arbor, 824 F.2d 489, 493 (6th Cir.1987); Keego Harbor Co. v. City of Keego Harbor, 657 F.2d 94, 98 (6th Cir.1981). This argument, however, is foreclosed by Justice Souter's concurrence in Barnes:
 
 
 28
 Our appropriate focus is not an empirical inquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental interest in the service of which the challenged application of the statute may be constitutional.... [L]egislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects.
 
 
 29
 Barnes, 501 U.S. at 582-84, 111 S.Ct. at 2469-70 (Souter, J., concurring in the judgment); see also Triplett Grille, 40 F.3d at 135. To the extent that Christy and Keego Harbor required a different analysis, they have been altered by controlling Supreme Court precedent.
 
 
 30
 Under this analysis, it is reasonable to conclude that the six-foot rule would further the state interests in the prevention of crime and disease. A prohibition on contact certainly limits the spread of disease. The record demonstrates that the addition of a buffer zone to the ban on contact was necessary to achieve that goal, given the repeated violations of the no-contact rule and testimony to the effect that, without a buffer zone, it was difficult to determine if contact actually occurred or who was responsible. With respect to crime, just as the State of Indiana could conclude that "the higher incidence of prostitution and sexual assault in the vicinity of adult entertainment locations results from the concentration of crowds of men predisposed to such activities, or from the simple viewing of nude bodies," Barnes, 501 U.S. at 586, 111 S.Ct. at 2470 (Souter, J., concurring in the judgment), so too could the City of Chattanooga conclude that similar results obtain from similar concentrations of crowds, or from the viewing of nearly-nude bodies at an overly close proximity.
 
 
 31
 With respect to the third part of the O'Brien test, controlling precedent establishes that the goals of crime and disease prevention are content-neutral. "[O]n its face, the governmental interest in combating prostitution and other criminal activity is not at all inherently related to expression." Barnes, 501 U.S. at 585, 111 S.Ct. at 2470 (Souter, J., concurring in the judgment). Justice Souter rejected the dissent's contention that the crime at issue in that case arose from the persuasive effects of the expressive activity, arguing, as discussed above, that the mere fact of concentration of crowds or the viewing of even a non-expressive nude body could provide the causal link. Id. at 585-86, 111 S.Ct. at 2470-71 (Souter, J., concurring in the judgment).
 
 
 32
 In this case, the plaintiffs have challenged the content neutrality of the ordinance by reciting a list of similar activities that the City has seen fit not to regulate.[7] While in general there is no such thing as a First Amendment challenge for "underbreadth," see R.A.V. v. City of St. Paul, 505 U.S. 377, 387, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992), in some rare cases, the underinclusiveness of a law--i.e., the failure of the government to regulate other, similar activity--may give rise to a conclusion that the government has in fact made an impermissible distinction on the basis of the content of the regulated speech. See Ater v. Armstrong, 961 F.2d 1224, 1229 (6th Cir.1992). This is not one of those cases. The plaintiffs refer to the sale of the book The Joy of Sex, the availability of nudity on cable television, and the sale of vibrators in Chattanooga. We view this failure to regulate as affirmative proof, rather than a refutation, of the content-neutrality of the ordinance. The expressive content of the items in plaintiffs' laundry list of unregulated transactions is virtually identical to that of erotic dancing; however, none of the items carries with it the same danger of crime and disease that the adult cabarets do. The plaintiffs further challenge the failure of the City to regulate performances of Hair and Oh! Calcutta!--both of which feature nudity--and the growing practice of holding "wet T-shirt" contests in bars in Chattanooga.[8] However, the City could reasonably have concluded that such activities did not pose the same risks as "contact" erotic dancing does.
 
 
 33
 It is difficult to see, for example, how the enforcement of Indiana's statute against nudity in a production of "Hair" or "Equus" somewhere other than an "adult" theater would further the State's interest in avoiding harmful secondary effects, in the absence of evidence that expressive nudity outside the context of Renton-type adult entertainment was correlated with such secondary effects.
 
 
 34
 Barnes, 501 U.S. at 585 n. 2, 111 S.Ct. at 2470 n. 2 (Souter, J., concurring in the judgment); see also Triplett Grille, 40 F.3d at 136 (invalidating ordinance because city failed to show evidence of link between "high-culture" nudity and secondary effects).[9]
 
 
 35
 With respect to the final part of the O'Brien test, the district court concluded that the restriction of the six-foot buffer zone was not substantially greater than necessary to achieve the City's interests in the prevention of crime and disease. In considering this part, we are mindful that a regulation of speech
 
 
 36
 must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.
 
 
 37
 Ward v. Rock Against Racism, 491 U.S. 781, 798-99, 109 S.Ct. 2746, 2757-58, 105 L.Ed.2d 661 (1989) (internal citations and quotation omitted). We believe that the ordinance satisfies the Ward analysis. As discussed above, a buffer zone is necessary in order to ensure that the ban on contact is enforceable. In addition, the buffer zone serves to prevent the occurrence of activities that, while not involving contact, nonetheless border on proscribable sexual conduct; for example, several police officers testified that portions of their undercover investigation involved dancers attempting to stimulate them by breathing on various parts of their bodies. Furthermore, the "whipped cream" dance described above did not directly involve contact, but nonetheless imposed the risk of transmission of disease.[10] Finally, the City could reasonably have determined that the category of men who frequent a nightclub for the purpose of viewing near-nudity in close proximity--or for the purpose of physically touching the nearly nude--is more prone to crime than the category of men who do so for the purpose of viewing near-nudity from a distance. The City Council determined that a six-foot zone struck the appropriate balance; while it is probable that each marginal foot of the buffer zone achieves each of these goals somewhat less efficiently, it is not for us to say that a seven-foot zone or a five-foot zone would strike a better balance.
 
 
 38
 The plaintiffs assert that the buffer zone is broader than necessary because it will force them to engage in expensive renovations of the Diamonds and Lace Showbar. They also argue that customers are motivated to reward the dancers with tips when they are in close proximity to the dancers, and that therefore a distance requirement will lead directly to a decrease in revenues for the dancers. However, "[t]he inquiry for First Amendment purposes is not concerned with economic impact. In our view, the First Amendment requires only that [Chattanooga] refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city." Renton, 475 U.S. at 54, 106 S.Ct. at 932 (internal citation omitted). In other words, we consider the economic effects of the ordinance in the aggregate, not at the individual level; if the ordinance were intended to destroy the market for adult cabarets, it might run afoul of the First Amendment, but not if it merely has adverse effects on the individual theater. See Spokane Arcade, Inc. v. City of Spokane, 75 F.3d 663, 665-66 (9th Cir.1996). Although the plaintiffs did not present the district court with evidence regarding the effect of the ordinance on the market for adult cabarets in Chattanooga, the district court did find that DLS could comply with the ordinance by installing brass rails at a cost of about $5,000. We therefore infer that, in the aggregate, the ordinance does not foreclose a "reasonable opportunity" to operate an adult cabaret. Accordingly, we join those courts that have determined that similar buffer-zone requirements are sufficiently narrowly tailored to be valid regulations under the First Amendment. See BSA, Inc. v. King County, 804 F.2d 1104, 1111 (9th Cir.1986) (six feet); Kev, Inc. v. Kitsap County, 793 F.2d 1053, 1061 (9th Cir.1986) (ten feet); Colacurcio v. Kent, 944 F.Supp. 1470, 1477 (W.D.Wash.1996) (ten feet); Zanganeh v. Hymes, 844 F.Supp. 1087, 1091 (D.Md.1994) (six feet); T-Marc, Inc. v. Pinellas County, 804 F.Supp. 1500, 1506 (M.D.Fla.1992) (three feet).
 
 V. The License and Permit Procedures
 
 39
 Two aspects of the ordinance's licensing scheme are before us on appeal: the procedural system prescribed by the ordinance for the award or denial of licenses under Chattanooga, Tenn., City Code §§ 11-424 and 11-425, and the substantive standards for the award of licenses or permits under City Code §§ 11-425 and 11-428. The district court held the former provisions to be constitutionally permissible, and found that the plaintiffs lacked standing to challenge the latter provisions. On appeal, the defendants argue that the plaintiffs lack standing to challenge either set of provisions, because DLS and Ann Martin are already properly licensed to operate an adult-oriented establishment, and the remaining plaintiffs also already possess valid permits to be employed by such an establishment.
 
 
 40
 We reach a result opposite to that of the district court; we believe that the plaintiffs have standing to challenge the substantive criteria for the issuance of licenses or permits, but lack standing to challenge the licensing scheme. Only DLS and its owner, Ann Martin, could have standing to challenge the license procedures of §§ 11-424 and 11-425; the other plaintiffs are governed by the permit procedures of §§ 11-427 and 11-428, and they obtained the relief that they sought on those sections from the district court. Both DLS and Martin, however, already have succeeded in obtaining a license under §§ 11-424 and 11-425. If they are to be subject to any future threat of injury from actions by the City, that threat will arise under the materially different procedures for renewals or revocations of licenses under §§ 11-431 or 11-432. Therefore, they cannot demonstrate that their challenge to the licensing procedures satisfies the three core requirements for standing under Article III:(1) "injury in fact," by which we mean an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury fairly can be traced to challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative.
 
 
 41
 G & V Lounge, Inc. v. Michigan Liquor Control Comm'n, 23 F.3d 1071, 1074 (6th Cir.1994), quoting Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville, 508 U.S. 656, 663-64, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586 (1993). Any modification to the licensing scheme would have no effect on the potential threat that DLS or Martin face under renewal or revocation proceedings.
 
 
 42
 In contrast, we believe that the plaintiffs do have standing to challenge the substantive criteria for licenses and permits. Although all of the plaintiffs currently possess valid permits, each plaintiff must apply annually for renewal under § 11-431, and are also subject to possible revocation proceedings under § 11-432. We read the ordinance to specify that the standards for the issuance of a license or permit apply also to renewal or revocation proceedings. See Chattanooga, Tenn., City Code § 11-432(a)(3) (license shall be revoked if "[t]he operator or employee becomes ineligible to obtain a license or permit"). Each of the plaintiffs wishes to engage in activities that are proscribed by the ordinance. In addition, plaintiff Chadwick has been charged with a violation of the ordinance in Chattanooga City Court. Because §§ 11-425 and 11-428 disqualify an applicant who has violated the ordinance from receiving a license or a permit, the plaintiffs satisfy the three-part test for standing described above. Furthermore, the fact that no revocation proceedings are currently pending is immaterial; just as a plaintiff need not go through the formality of submitting an application in a facially unconstitutional licensing scheme, see Freedman v. Maryland, 380 U.S. 51, 56, 85 S.Ct. 734, 737-38, 13 L.Ed.2d 649 (1965), so too a current license-holder "does not have to wait until his license is revoked to have standing to challenge the allegedly overbroad licensing scheme that would allow its revocation." G & V Lounge, 23 F.3d at 1075.
 
 
 43
 Though plaintiffs have standing to pursue their challenge, that challenge is meritless. The ordinance poses three substantive requirements for the issuance of a license or permit; the applicant:[11] (1) must be at least eighteen years of age; (2) must not have been convicted of or pleaded nolo contendre to "a felony or any crime involving moral turpitude, prostitution, obscenity, or other crime of a sexual nature" within the past five years; and (3) must not have been found to have violated the ordinance within the past five years. Chattanooga, Tenn., City Code §§ 11-425, 11-428. The plaintiffs' only argument against these criteria is that the fact that they were not enforced against the productions of Hair or Oh! Calcutta! demonstrates that they vest the City with unbridled discretion to award or to deny licenses or permits. However, as discussed above, the ordinance did not even apply to those productions; therefore this argument is baseless. In our view, the ordinance survives the First Amendment challenge; it does not allow City officials to "exercise discretion by passing judgment on the content of the protected speech," FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 229, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990), and it sufficiently limits the discretion of the decision-maker. See City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757, 108 S.Ct. 2138, 2144, 100 L.Ed.2d 771 (1988). Indeed, the only criterion that is not wholly objective is the requirement that the applicant not be convicted of a "crime of moral turpitude." While that phrase carries with it the potential for ambiguity, it is a defined term of art in Tennessee. In State v. Morgan, 541 S.W.2d 385 (Tenn.1976), the Tennessee Supreme Court noted that prior case law interpreting that phrase had been vague and inconsistent, and resolved those difficulties by adopting the definition found in Fed.R.Evid. 609 of crimes on which a witness is subject to impeachment, i.e., a crime punishable by death or more than one year of imprisonment, or a crime involving dishonesty. Id. at 388-89. Therefore, the decision-maker under the Chattanooga ordinance is constrained by objective criteria, and the standards for licenses and permits under §§ 11-425 and 11-428 do not violate the First Amendment.
 
 VI. Conclusion
 
 44
 The judgment of the district court is therefore AFFIRMED.
 
 
 
 [1]
 Between 1987 and 1995, the City also enacted three amendments to the ordinance--an amendment reflecting the change in the City's governmental structure from a Board of Commissioners to a City Council, Ordinance No. 9654 (Jan. 6, 1992); an amendment requiring the City, after the denial of an application for a license, to bring suit for a declaratory judgment that the application was properly denied, Ordinance No. 9980 (Nov. 23, 1993); and an amendment revising the definition of "adult cabaret," Ordinance No. 9982 (Dec. 14, 1993). None of those amendments are implicated in this appeal
 
 
 [2]
 The plaintiffs have asserted that they failed to gain a ruling from the district court on all of their challenges, and have requested this court to remand the case so that they could obtain such a ruling. This request is misguided. As noted above, the district court in fact did rule on all of the plaintiffs' claims. DLS, 894 F.Supp. at 1147
 
 
 [3]
 Plaintiffs have not challenged the height requirement, as all of the performances at the Diamonds and Lace Showbar already occur on stages that are at least eighteen inches high. In any event, we believe the height requirement to be valid under the analysis applicable to the distance requirement
 
 
 [4]
 The Barnes Court, which upheld Indiana's statute prohibiting public nudity as applied to nude erotic dancing, fractured into four opinions, no one of which commanded the votes of a majority of the Court. The Chief Justice, joined by two justices, wrote a plurality opinion arguing that the statute was justified by the state's substantial interest in protecting societal order and morality. 501 U.S. at 562, 111 S.Ct. at 2458 (plurality opinion). Justice Scalia concurred in the judgment on the ground that, since the statute was a law of general applicability, no First Amendment analysis was necessary to uphold it. Id. at 572, 111 S.Ct. at 2463-64 (Scalia, J., concurring in the judgment). Justice Souter also concurred in the judgment, for the reasons described in the text below. Id. at 581, 111 S.Ct. at 2468 (Souter, J., concurring in the judgment). Justice White, joined by three justices, dissented. Id. at 587, 111 S.Ct. at 2471 (White, J., dissenting)
 The Supreme Court has instructed lower courts that, where no one opinion commands a majority of the Court, they should follow the opinion that concurred in the judgment on the narrowest grounds. See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993-94, 51 L.Ed.2d 260 (1977). This court has determined that Justice Souter's concurrence was the narrowest opinion in Barnes, and that therefore we are bound to follow its reasoning. See Triplett Grille, 40 F.3d at 134. We noted in that case that the Marks rule applies even in those cases where no one opinion describes a line of reasoning to which a majority of the Court subscribes. In any case in which the Court does not produce a majority opinion, and there are several different issues on which the members of the Court disagree, it may follow that no single line of reasoning can be described that is both internally consistent and is subscribed to by a majority with respect to each premise and conclusion. See generally Kenneth Arrow, Social Choice and Individual Values (2d ed.1963); see also Frank H. Easterbrook, Ways of Criticizing the Court, 95 Harv.L.Rev. 802, 823-31 (1982). Nevertheless, we do not have the freedom to pick and choose which premises and conclusions we will follow, but instead, with respect to a particular issue, must follow the reasoning of the concurring opinion with the narrowest line of reasoning on that issue.
 
 
 [5]
 In determining whether expressive activity is at issue, we are mindful that speech need not be limited to a "particularized message," because such a limitation would exclude "the unquestionably shielded painting of Jackson Pollack, music of Arnold Schonberg, or Jabberwocky verse of Lewis Carroll." Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, --- U.S. ----, ----, 115 S.Ct. 2338, 2345, 132 L.Ed.2d 487 (1995)
 
 
 [6]
 That statute, and the ordinance before us, could also be judged under the standard for regulations of the time, place, or manner of speech. The Supreme Court has noted that that standard is materially identical to the O'Brien test. See Clark v. Community for Creative Non-Violence, 468 U.S. 288, 298, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221 (1984); see also East Brooks Books, Inc. v. City of Memphis, 48 F.3d 220, 226 n. 5 (6th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 277, 133 L.Ed.2d 198 (1995)
 
 
 [7]
 The plaintiffs have styled this argument as a challenge to the ordinance under the Equal Protection Clause. In cases such as this one, the Equal Protection Clause adds nothing to the First Amendment analysis; if a sufficient rationale exists for the ordinance under the First Amendment, then the City has demonstrated a rational basis for the alleged disparate treatment under the Equal Protection Clause. See Renton, 475 U.S. at 55 n. 4, 106 S.Ct. at 933 n. 4; Young v. American Mini Theatres, 427 U.S. 50, 63-73, 96 S.Ct. 2440, 2448-54, 49 L.Ed.2d 310 (1976) (plurality opinion)
 
 
 [8]
 Neither the plays nor the contests would fall within the reach of the ordinance, as they do not occur at facilities that are principally devoted to such activities. Chattanooga, Tenn., City Code § 11-422(e)
 
 
 [9]
 In Triplett Grille, this court carefully recited that "high-culture" and "low-culture" nudity are distinguishable for First Amendment purposes because there is evidence of crime and other effects associated with the latter, but not with the former. We reiterate that the distinction is based on that correlation, and not on a belief that one form of speech is inherently more worthy or deserving of protection than the other. Unfortunately, some courts have followed the latter line of reasoning. See City of Chattanooga v. McCoy, 645 S.W.2d 400, 403 (Tenn.1983) (construing Chattanooga, Tenn., City Code § 25-28--which is not at issue in this case--as not regulating "legitimate speech" that "contribute[s] to society's permanent values")
 
 
 [10]
 An officer of the Chattanooga Health Department testified at trial that it would be more difficult to perform that dance, and consequently it would be more difficult for disease to be transmitted, if a six-foot distance requirement were in effect
 
 
 [11]
 For corporations or partnerships, these requirements apply to officers, directors, stockholders, or parties possessing a financial interest in the entity