163 F.3d 545
 98 Cal. Daily Op. Serv. 8965, 98 Daily Journal
D.A.R. 12,449
Frank COLACURCIO, Jr., dba DDF & S Investment Co.; David
Ebert, dba DDF & S Investment Co.; Steve Fueston,
dba DDF & S Investment Co., Plaintiffs-Appellants,
v.
CITY OF KENT, Defendant-Appellee.
 No. 96-36197.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 10, 1998.
Decided Dec. 8, 1998.
 
 Gilbert H. Levy, Levy & Hamilton, Seattle, WA, for plaintiffs-appellants.
 William P. Schoel and Jayne L. Freeman, Keating, Bucklin & McCormack, Seattle, WA, Roger A. Lubovich, City Attorney, Laurie A. Evezich, Assistant City Attorney, Kent, WA, for defendant-appellee.
 Appeal from the United States District Court for the Western District of Washington; Thomas S. Zilly, District Judge, Presiding. D.C. No. CV-95-01176-TSZ.
 Before: HUG, Chief Judge, and REINHARDT and WIGGINS, Circuit Judges.
 Opinion by Chief Judge HUG; Dissent by Judge REINHARDT.
 HUG, Chief Judge:
 
 
 1
 In this case we examine whether the district court was correct in concluding as a matter of law that the City of Kent's ordinance, which requires nude dancers to perform at least ten feet from patrons, does not violate the First Amendment of the United States Constitution. Appellants, who planned to open a nightclub featuring nude dancing on stage and personalized table dancing, argue that the ten-foot distance requirement amounts to a complete ban on table dancing, which they allege is a unique form of expression entitled to separate First Amendment analysis. We have jurisdiction under 28 U.S.C. § 1291. We affirm.
 
 I.
 Factual Background
 
 2
 Appellants desire to open a non-alcoholic adult nightclub in the City of Kent, Washington, featuring nude dancing on stage and personalized table dances. Appellants located a site in Kent and applied for a building permit.
 
 
 3
 The City of Kent has examined issues related to adult entertainment for several years. In 1982, the City's planning department published a study on the effects of adult entertainment on surrounding communities, including a discussion of various regulatory alternatives. Kent's initial regulatory effort involved a zoning ordinance, which Appellants challenged in 1994. The district court found that the zoning ordinance failed to designate a sufficient number of sites for the location of adult businesses. Pursuant to a settlement agreement, the City agreed to treat Appellants' proposed business as a lawful non-conforming use under the zoning law.
 
 
 4
 In March 1995, the Kent City Council adopted Adult Entertainment Ordinance 3214, establishing new standards for the licensing and operation of adult uses in Kent. In April 1995, that ordinance was amended by Ordinance 3221, in an effort to conform the legislation to the King County Superior Court's ruling on a similar ordinance in Bellevue, Washington. Ordinance 3221, which has been codified as Kent City Code § 5.10.010 et seq., provides, in relevant part:
 
 
 5
 The portion of the exotic dance studio premises in which dancing and adult entertainment by an entertainer is performed shall be a stage or platform at least twenty-four (24) inches in elevation above the level of the patron seating areas. KCC § 5.10.110(A).
 
 
 6
 No dancing or adult entertainment by an entertainer shall occur closer than ten (10) feet to any patron. KCC § 5.10.120(A)(3).
 
 
 7
 The code also specifies minimum lighting requirements and prohibits dancers from soliciting or receiving tips from patrons. Shortly after enactment of the ordinance, Appellants brought this action for declaratory relief and damages pursuant to 42 U.S.C. § 1983.
 
 
 8
 Appellants contend that the ten-foot rule would effectively eliminate table dancing, which they argue is a unique form of expression entitled to separate First Amendment analysis. Unlike nude dancing performed on stage, table dancing is performed in close proximity to patrons. Appellants have submitted declarations of a cultural anthropologist and a communications expert attesting to the uniqueness of table dancing and the potentially detrimental effects of the ten-foot rule on the dancers' erotic messages. Appellants also argue that table dancing is the primary source of income for exotic dancers, and that the Kent ordinance would make it uneconomical and therefore impossible for exotic dance studios to open or operate in Kent.
 
 
 9
 The City filed a motion for summary judgment, which the district court granted in November 1996. The district court ruled as a matter of law that (1) the ordinance was a content-neutral time, place and manner regulation; and (2) the ten-foot distance requirement was narrowly tailored and left open ample alternative avenues for communication of protected artistic expression. Appellants filed a timely notice of appeal.
 
 II.
 Standard of Review
 
 10
 A grant of summary judgment is reviewed de novo. Covey v. Hollydale Mobilehome Estates, 116 F.3d 830, 834 (9th Cir.1997). We must determine, viewing the evidence in the light most favorable to Appellants, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id. We do not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue of material fact for trial. Id. When a mixed question of fact and law involves undisputed underlying facts, summary judgment may be appropriate. Han v. Mobil Oil Corp., 73 F.3d 872, 875 (9th Cir.1995).
 
 III.
 Level of Protection for Nude Dancing
 
 11
 The parties and the district court correctly acknowledge that nude dancing is a form of expressive conduct protected, to some degree, by the First Amendment.[1] There is understandable confusion, however, about the level of such protection. The district court cited a plurality opinion of the Supreme Court indicating that nude dancing "is expressive conduct within the outer perimeters of the First Amendment, though ... only marginally so." Barnes v. Glen Theatre, Inc., 501 U.S. 560, 565-566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Appellants cite to pre-Barnes Ninth Circuit precedent which accorded nude dancing full First Amendment protection. Kev, Inc. v. Kitsap County, 793 F.2d 1053, 1058 (9th Cir.1986).
 
 
 12
 The fragmented nature of Supreme Court opinions dealing with nude dancing in particular and sexually explicit but non-obscene conduct in general has resulted in a lack of clear guidance on the level of First Amendment protection afforded to this type of expression. In Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), which involved a zoning ordinance governing the location of adult theaters, a plurality of the Court agreed that adult entertainment should be regarded as "low value" speech: "[F]ew of us would march our sons and daughters off to war to preserve the citizen's right to see 'Specified Sexual Activities' exhibited in the theaters of our choice." Id. at 70, 96 S.Ct. 2440. However, five Justices in Young, one concurring and four dissenting, argued that First Amendment protection should not vary with the social value ascribed to speech by the courts. See id. at 73 n. 1, 96 S.Ct. 2440 (Powell, J., concurring); Id. at 85-87, 96 S.Ct. 2440 (Stewart, J., dissenting). Writing for our court in 1986, Judge Pregerson in Kev alluded to the voting tally in Young when he ascribed full First Amendment protection to nude dancing. Kev, 793 F.2d at 1058.
 
 
 13
 Fifteen years after Young, a plurality of the Supreme Court including Justices Rehnquist, O'Connor, and Kennedy, reiterated that nude dancing enjoys only marginal First Amendment protection. Barnes, 501 U.S. at 565-66, 111 S.Ct. 2456.[2] Two Justices concurred in Barnes, with four dissenters advocating full First Amendment protection. Because one concurrence did not reach the issue, Barnes represents a four-four split on the matter.[3]
 
 
 14
 Scholars have grappled with the problem of the uncertain status of nude dancing and adult entertainment under the First Amendment. Professor Lawrence Tribe noted that "no Court has yet squarely held that sexually explicit but non-obscene speech enjoys less than full First Amendment protection." Tribe, American Constitutional Law §§ 12-18, p. 938 (2d Ed.1988). Although his comment was made prior to Barnes, the observation continues to be accurate today. Professor Erwin Chemerinsky views Supreme Court precedent as according sexually explicit expression "low-value" status. Chemerinsky, Constitutional Law § 11..3.4.4, p. 836-41 (1st Ed.1997). Professors Gerald Gunther and Kathleen Sullivan suggest that even in cases where courts do not explicitly treat sexual expression as lower-value speech, the decisions have implicitly treated such speech as a "subordinate species" in their tolerance of content-specific regulation. Gunther and Sullivan, Constitutional Law § 5(D), p. 1155-56 (13th Ed.1997).
 
 IV.
 Content Neutrality
 
 15
 Appellants contend that the district court erred in determining that the Kent Ordinance is content-neutral as a matter of law. Appellants argue that the ordinance is content-based on its face, and that the record shows that the City's predominant intent in passing the Ordinance was to ban adult entertainment in Kent. This contention is based on statements made by the mayor and other city officials, in addition to Kent's alleged pattern of adopting restrictive ordinances in response to proposals to build exotic dance studios.
 
 
 16
 Municipalities may impose reasonable restrictions on the time, place or manner of protected speech, provided the restrictions are: (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communication of the information. Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The Supreme Court has determined that this test is similar or identical to the O'Brien test generally applied to regulations affecting symbolic speech.[4]
 
 
 17
 In determining whether an ordinance is content-neutral, our principal inquiry is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward, 491 U.S. at 791, 109 S.Ct. 2746. The content-neutrality requirement is met if the involved ordinance is " 'aimed to control secondary effects resulting from the protected expression,' rather than at inhibiting the protected expression itself." Tollis, Inc. v. San Bernardino County, 827 F.2d 1329, 1332 (9th Cir.1987)(quoting Int'l Food and Beverage Systems v. City of Fort Lauderdale, 794 F.2d 1520, 1525 (11th Cir.1986)). See also Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-48, 106 S.Ct. 925, 89 L.Ed.2d 29. Secondary effects may include, but are not limited to, threats to public health or safety. Building upon the Supreme Court's reasoning in Renton, we outlined the appropriate test in Tollis:
 
 
 18
 If the ordinance is predominantly aimed at the suppression of First Amendment rights, then it is content-based and presumptively violates the First Amendment. If, on the other hand, the predominant purpose of the ordinance is the amelioration of secondary effects in the surrounding community, the ordinance is content-neutral, and the court must then determine whether it passes constitutional muster as a content-neutral time, place and manner regulation.
 
 
 19
 827 F.2d at 1332 (internal citation omitted).
 
 
 20
 A city may establish its interest in a regulation by relying upon evidence "reasonably believed to be relevant to the problem that the city addresses." Renton, 475 U.S. at 51-52, 106 S.Ct. 925. In evaluating the secondary effects of adult entertainment, the city is also permitted to rely on experiences of other jurisdictions. Id. A regulation is content-neutral if it is "justified without reference to the content of the regulated speech." Id. at 48, 106 S.Ct. 925 (quoting Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). A finding that the restriction of First Amendment speech is a "motivating factor" in enacting an ordinance is not of itself sufficient to hold the regulation presumptively invalid. Id. at 46-49, 106 S.Ct. 925.
 
 
 21
 The case law has not clarified when secondary effects warrant restriction of speech and how much proof there must be of these effects.[5] Similarly, precedent provides no standards for determining when an illicit but inconsequential "motivating factor" might develop into an illicit and controlling "predominant purpose." Precedent suggests that government defendants generally will prevail on the issue of content neutrality if evidence shows that the enactment can be "justified without reference to ... speech." See Kev, 793 F.2d. at 1058-59 (internal quotations and citations omitted). This is a difficult standard to overcome, unless the challenger can show that the statute is speech-discriminatory on its face. See, e.g., BSA, Inc. v. King County, 804 F.2d 1104, 1108-09 (9th Cir.1986) (holding unconstitutional county ordinances which specifically exempted barroom nude dancing from their definitions of "expressive dance," thus effecting complete bans on nude dancing).
 
 
 22
 Contrary to Appellants' contention, the Kent ordinance is not content-based on its face. The ordinance does not distinguish between table dancing and other exotic dance forms. Nor do the stated purposes mention the ills of table dancing or the goals of restricting offensive conduct. The ten-foot distance requirement applies to all forms of dancing within exotic dance studios.
 
 
 23
 We will look to the full record to determine whether evidence indicates that the purpose of the ordinance is to suppress speech or ameliorate secondary effects. In so doing, we will rely on all "objective indicators of intent," including the "face of the statute, the effect of the statute, comparison to prior law, facts surrounding enactment, the stated purpose, and the record of proceedings." City of Las Vegas v. Foley, 747 F.2d 1294, 1297 (9th Cir.1984). The district court was correct in rejecting the City's claim that the court need only look to the stated purposes of the ordinance to find a permissible purpose.
 
 
 24
 Appellants cite to statements by city officials and others allegedly revealing the City's underlying speech-suppressive purposes. For example, Appellants quote the following statement by the City Attorney at a Planning Commission meeting:
 
 
 25
 Since we cannot zone these type[s] of businesses out of the City, the licensing was looked at that was in place for this type of facility ... As indicated, these uses cannot be prohibited, but they can be regulated.
 
 
 26
 Appellants also cite the following statement from the Planning Committee Chairman:
 
 
 27
 With all the regulations we have adopted and stuff, I'm not too concerned that someone's going to come and try to open something up. Because we've made it a little bit difficult for them to make money in the traditional way they make money.
 
 
 28
 In determining the extent to which comments such as these should inform our analysis of predominant intent, we look to our decision in Foley. In Foley, we noted that individual statements by city leaders were admissible if they "showed the chain of events from which intent may be inferred, rather than merely the subjective intent of individual legislators." Id. at 1298. Put another way, the subjective statements cited by Appellants are relevant if they show objective manifestations of an illicit purpose, such as a departure from normal procedures or a sudden change in policy.[6] In the present case, the record does not indicate unusual procedural maneuvering on the part of the Kent Planning Committee, Planning Commission, City Attorney, or other City governing bodies. The enactment of the Kent Ordinance was consistent with the City's comprehensive planning policy, and reflects no procedural lapses that might suggest unjust treatment. Objective indicators of illicit purpose are not present here.
 
 
 29
 Appellants disagree, contending that Kent's history reflects a clear pattern of adopting "the most restrictive regulations possible" in response to proposals to build nude dance studios in the City. This contention is rebutted by the record. The record indicates that Kent's approach has grown more lenient over time. Evidence suggests that after the failed zoning attempt, City leaders learned that unduly restrictive regulations would not survive judicial review. The City Attorney's comments at a 1995 Planning Commission meeting reflect this awareness: "These uses cannot be prohibited but they can be regulated ... the question is where do we put this type of business and how many sites do we allow." The record indicates that the City devoted considerable resources to developing an ordinance that would be constitutionally sound. Kent's distance requirements were modeled after regulations upheld in Kitsap County, Bellevue, King County, and Kelso.[7]
 
 
 30
 Even if we were to accord substantial weight to the mixed motivations of certain City officials, the record indicates that the City's documentation of permissible purposes satisfies Virginia Pharmacy Board and Renton. Kent's ordinance was based on a comprehensive study of adult entertainment businesses and their secondary impacts. In formulating the ordinance, the City relied on the study, concluding that regulation of adult uses was an important factor in controlling prostitution, drug dealing, and other criminal activity. See e.g., Lakeland Lounge of Jackson, Inc. v. City of Jackson, 973 F.2d 1255, 1258 (5th Cir.1992) (treating reliance on formal studies as evidence of permissible purpose). The record also includes affidavits and statements by police officers and vice detectives documenting the connection between table dancing and illegal sexual activity. We find, therefore, that the Kent Ordinance is justified without reference to speech.
 
 V.
 Narrow Tailoring
 
 31
 Appellants argue that the ten-foot distance requirement fails the narrow tailoring requirement because there are less-speech-restrictive means of achieving the same results. Appellants contend that summary judgment was improper because the district court failed to consider less burdensome alternatives such as a "no touch" ordinance and a one-foot distance requirement.
 
 
 32
 A regulation of the time, place or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests, but it need not be the least restrictive or the least intrusive means of doing so. Ward, 491 U.S. at 798-99, 109 S.Ct. 2746. "Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " Id. at 799, 109 S.Ct. 2746 (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). This standard does not mean that a time, place or manner regulation may burden substantially more speech than necessary to further the government's interests. "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward, 491 U.S. at 799, 109 S.Ct. 2746.
 
 
 33
 The validity of a time, place, or manner regulation "does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests." Albertini, 472 U.S. at 689, 105 S.Ct. 2897 (citing Clark, 468 U.S. at 299, 104 S.Ct. 3065). Such restrictions will not violate the First Amendment "simply because there is some imaginable alternative that might be less burdensome on speech." Albertini, 472 U.S. at 689, 105 S.Ct. 2897.
 
 
 34
 The district court was correct in concluding that the ten-foot setback is narrowly tailored to achieve Kent's objectives. The courts have emphasized that judges should not supplant the legislature's role in developing the most appropriate methods for achieving government purposes. See, e.g., DLS, Inc. v. City of Chattanooga, 107 F.3d 403, 413 (6th Cir.1997) (upholding a six-foot distance requirement, the court stated that "it is not for us to say that a seven-foot zone or a five-foot zone would strike a better balance.")As to whether the ordinance burdens substantially more expression than necessary, the district court was correct in concluding that this argument is foreclosed by our earlier decision in Kev, which upheld a similar ten-foot distance requirement. Kev, 793 F.2d at 1061. Appellants argue that because Kev was decided prior to the Supreme Court's decision in Ward, the Kev court did not have occasion to apply the Ward test, which protects speech from unnecessary burdens. See Ward, 491 U.S. at 798, 109 S.Ct. 2746.
 
 
 35
 This argument fails for two reasons. First, we need not reach the issue, as we leave the fine-tuning of the distance requirement to the legislative body. Second, at the time Kev was decided, Supreme Court precedent included speech-protective language similar or identical to that in Ward. See, e.g, Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 810, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (requiring the ordinances in question to "respond [ ] precisely to the substantive problem which legitimately concerns [the government].") (emphasis added); Clark, 468 U.S. at 297, 104 S.Ct. 3065 (same); O'Brien, 391 U.S. at 377, 88 S.Ct. 1673 (requiring the incidental restrictions on First Amendment freedoms to be "no greater than is essential to the furtherance" of the asserted governmental interests).
 
 
 36
 Several courts have upheld distance requirements as a narrowly tailored means of controlling illegal sexual contact and narcotics transactions. In BSA Inc., we upheld a six-foot distance requirement while prohibiting a total ban on nude barroom dancing, stating that the distance requirement "imposes at most a very minimal restriction on First Amendment activity." 804 F.2d at 1112. The four dissenting Justices in Barnes, arguing against the statewide ban on public nudity, supported distance requirements as a less-restrictive means of furthering the government's interest in protecting public health and safety. Barnes, 501 U.S. at 594, 111 S.Ct. 2456. See also, DLS, Inc. v. Chattanooga, 107 F.3d 403 (6th Cir.1997) (six-foot distance requirement); City of Colorado Springs v. 2354, Inc., 896 P.2d 272 (Colo.1995) (en banc) (three-foot); Zanganeh v. Hymes, 844 F.Supp. 1087 (D.Md.1994) (six-foot); T-Marc, Inc. v. Pinellas County, 804 F.Supp. 1500 (M.D.Fla.1992) (three-foot); Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 937 P.2d 154 (Wa.1997) (en banc) (four-foot).
 
 
 37
 Furthermore, the less-restrictive alternatives presented by Appellants arguably are not "reasonable" alternatives as they would not serve the City's purposes of controlling drug transactions and prostitution. The one-foot and "no-touch" ordinances would be unenforceable, as both would fail to provide sufficient line-of-vision for law enforcement personnel. An earlier "no-touch" ordinance in Kent failed for this reason. In addition, both of these options would permit verbal communication between dancers and patrons, thereby failing to curtail propositions for drugs or sex.[8] It is unclear from the record whether Appellants would support a four-foot distance requirement. While claiming at one point that such a regulation would be narrowly tailored, Appellants state elsewhere in the record that a four-foot requirement put them out of business in Bellevue. Although a four-foot distance requirement would keep patrons and dancers just out of arm's reach, a ten-foot requirement covers two arm spans and keeps patrons out of earshot. Appellants have failed to present evidence showing that a ten-foot rule burdens substantially more expression than necessary to achieve its purpose. We find, therefore, that summary judgment was proper on the issue of content-neutrality.
 
 VI.
 Alternative Channels of Communication
 
 38
 The final attribute of a valid time, place and manner regulation is that it must "leave open ample alternative channels for communication of the information." Ward, 491 U.S. at 791, 109 S.Ct. 2746. What makes this case unusual is Appellants' claim that table dancing is a unique form of protected expression that is qualitatively different from nude stage dancing and entitled to separate First Amendment analysis. Appellants contend that the Kent ordinance fails to leave open ample alternatives, as a ten-foot distance requirement would eliminate table dancing altogether, an essential element of which is close proximity between dancers and patrons. Appellants argue that, unlike stage dancing, table dancing uses "not just vision but multi-sensory perception to communicate its message though the sounds, smells, and movements of the dancer within the [patron's] intimate perimeter." Therefore, the district court misapplied the law by failing to acknowledge the uniqueness of table dancing and instead holding that the ordinance "merely diminishes to a limited degree the effectiveness of the erotic message conveyed by the dance." Appellants support their theory with declarations of a cultural anthropologist and a communications expert attesting to the uniqueness of table dancing and the detrimental effect of the ten-foot rule on the dancer's message.
 
 
 39
 The Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting. Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 525-27, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (Brennan, J., concurring). The Court has been particularly hesitant to close off channels of communication which provide individuals with inexpensive means of disseminating core political messages. See, e.g., City of Ladue v. Gilleo, 512 U.S. 43, 54-56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (ordinance banning residential signs almost completely foreclosed "a venerable means of communication that is both unique and important" and for which there is no adequate substitute, particularly for persons of modest means);[9] Martin v. City of Struthers, Ohio, 319 U.S. 141, 146, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) ("Door to door distribution of circulars is essential to the poorly financed causes of little people.").
 
 
 40
 Assuming arguendo that table dancing is a unique form of expression, precedent indicates that uniqueness, alone, is insufficient to trigger separate First Amendment protection. We recently emphasized this point in One World One Family Now v. City and County of Honolulu, 76 F.3d 1009 (9th Cir.1996). Acknowledging that a ban on wearing message-bearing T-shirts would raise serious constitutional questions, the same was not true for selling T-shirts: "[W]e do not believe the sale of message-bearing T-shirts is so 'uniquely valuable or important [a] mode of communication' as to be without effective substitute." Id. at 1015 (quoting City Council v. Taxpayers for Vincent, 466 U.S. 789, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (emphasis added)).[10]
 
 
 41
 Appellants' argument misses a central point--in assessing a First Amendment challenge, we look not only at the private claims asserted in the complaint, but into the governmental interests protected by the enactment. As the Supreme Court noted in R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), a "valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with ... 'secondary effects' of the speech, so that the regulation is 'justified without reference to the content of the ... speech.' " Id. at 389, 112 S.Ct. 2538 (quoting Renton, 475 U.S. at 48, 106 S.Ct. 925). Using this reasoning, we upheld an ordinance prohibiting "tagging," the practice of distributing flyers and soliciting funds from automobile passengers while stopped at red lights. Acorn v. City of Phoenix, 798 F.2d 1260 (9th Cir.1986). Although the appellants, a non-profit group, had argued that tagging was a "uniquely effective method of fundraising," id. at 1271, we determined that the ordinance was justified for traffic control and public safety purposes. Id. at 1268-70. See also Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 117 S.Ct. 855, 866, 137 L.Ed.2d 1 (1997) (holding that public safety interests justified fifteen-foot "fixed buffer zone" separating abortion protestors from abortion clinics). The prohibitions in Acorn and Schenck were upheld despite the fact that they were analyzed under the rigorous standards applied to speech regulation in traditional public forums, where "the government's ability to permissibly restrict expressive activity is very limited." United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).[11] We conclude that table dancing in private nightclubs, with documented links to prostitution and drug dealing, is a highly unlikely candidate for special protection under the First Amendment.
 
 
 42
 In support of their claim that the Kent ordinance effects a complete ban on a unique mode of expression, Appellants borrow from public forum analysis to argue that the applicable "forum" for a table dance is not the whole cabaret, but merely the area required for performing the table dance. According to this argument, the ten-foot distance requirement fails to leave open ample alternative avenues of expression within that forum.
 
 
 43
 Although the time, place and manner test applied to regulations affecting adult entertainment was initially developed for speech in public forums, Appellants are incorrect in attempting to extend all aspects of the public forum principle to private nightclubs. Even assuming the forum concept were applicable here, Appellants' argument fails due to the incongruity of its potential results. Following Appellants' logic, we would be required to provide separate First Amendment protection to so-called "lap dancing," arguably another unique form of expressive conduct in which the nude or semi-nude dancer performs in the patron's lap. Any distance requirement, even a one-foot setback, would amount to a flat ban on communication within that "forum."
 
 
 44
 Appellants' fluid definition of relevant forums, if carried to its logical conclusion, would require courts to subdivide audiences to the extent that any speech-restrictive regulation would necessarily fail. Again, Appellant's theory would lead to the ironic result that forms of expressive conduct with documented connections to criminal activity would enjoy special constitutional protection. The district court was correct in rejecting this proposition. If forum analysis is relevant here, the appropriate forum is the entire cabaret. Even assuming that the audiences for table dancing and stage dancing are distinguishable, there is undoubtedly a high degree of overlap. The ten-foot distance requirement does not rob dancers of their forum or their entire audience.
 
 
 45
 Appellants also provide an economic argument to support their claim that a ten-foot distance requirement would foreclose an entire medium of expression. Appellants contend that the distance requirement and prohibition on tipping would prevent exotic dancers from making a living in Kent, and would make it uneconomical and therefore impossible for adult clubs to open and operate in the city. Appellants allege that income from table dances is the main source of revenue for Appellants' entertainers, who are not compensated for stage dances. Table dancers in Appellants' establishments are independent contractors who pay rental fees to the dance studios. These fees are a primary source of revenue for the enterprise. Appellants allege that the four-foot distance requirement imposed in Bellevue caused profits to drop at their Bellevue establishment, requiring it to close.[12]
 
 
 46
 We recognize that determining whether a governmental action will foreclose an entire medium of expression can be a difficult undertaking. In some cases, as in Ladue (signs) or Struthers (handbills), a ban will be evident from the face of the ordinance. In other instances, as in the case at bar, it is not. The test for determining whether an adult business' First Amendment rights are threatened is whether a the government has "effectively den[ied]" the business "a reasonable opportunity to open and operate" within the city or area in question. Renton, 475 U.S. at 54, 106 S.Ct. 925. We elaborated on this test in Spokane Arcade, Inc. v. City of Spokane, 75 F.3d 663 (9th Cir.1996). The test is whether a business could operate under the regulations at issue, not whether a particular business will be able to compete successfully within the market. Id. at 666.[13] "[I]n the absence of any absolute bar to the market ... it is irrelevant whether '[a regulation] will result in lost profits, higher overhead costs, or even prove to be commercially unfeasible for an adult business'." Id. (quoting Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1531 (9th Cir.1993)).
 
 
 47
 The market access test has been applied to adult zoning cases, where total foreclosure of the market can be ascertained by calculating available locational sites. We have held unduly restrictive adult zoning ordinances to be unconstitutional on this basis. See, e.g., Walnut Properties, Inc. v. City of Whittier (Walnut Properties II ), 861 F.2d 1102, 1110 (9th Cir.1988) (holding that zoning ordinance's acute restriction on available acreage would deny adult theaters a reasonable opportunity to operate in the city, and would force closure of all existing adult businesses).
 
 
 48
 The analysis may be even more complicated when, as here, distance requirements are involved. However, Appellants have not presented economic evidence sufficient to show that the ten-foot distance requirement would serve as an absolute bar to market entry, as required under Spokane Arcade. Rather, Appellants have merely shown a potential loss in profits, which arguably could be remedied by restructuring the way they do business. The fact that Appellants hire their dancers on an independent contractor basis, refuse to pay their dancers for dancing on stage, require their dancers to pay rental fees, and limit their dancers' remuneration to tips from patrons, appears to us to be an effort to maximize profits while minimizing dancers' economic security.
 
 
 49
 As to Appellants' contention that table dancing is a unique form of expression entitled to separate First Amendment analysis, this issue is not outcome determinative, because uniqueness, alone, is insufficient to trigger special protection.
 
 VII.
 
 50
 For the reasons described herein, we determine that the district court was correct in ruling as a matter of law that the Kent ordinance is content neutral, and that the ten-foot distance requirement is narrowly tailored and leaves open ample alternative avenues for communication of protected expression. The judgment of the district court is
 
 
 51
 AFFIRMED.
 
 REINHARDT, Circuit Judge, dissenting:
 
 52
 I respectfully dissent. I believe that the district court erred in granting summary judgment. By requiring nude dancers to perform on a raised platform and to remain at least ten feet away from customers, the City of Kent effectively outlawed table-dancing. The issue before us is whether table dancing constitutes a separate form of expressive communication from other types of nude dancing-that is, whether table dancers communicate a message different in content than that communicated by nude stage dancers, and other nude dancers who perform at a distance of more than ten feet from their customers. The appellants presented sufficient evidence to establish a triable issue of fact on that question. By doing so, they have precluded a judicial determination that the ordinance is content-neutral as a matter of law. Because the district court reached that very conclusion, I would reverse and remand for trial.
 
 
 53
 As an initial matter, I disagree with Section III of the majority opinion, which resolves no legal issues, but seeks to leave the impression that nude dancing may merely be "low-value" speech entitled to "only marginal First Amendment protection." The panel admits that erotic dancing is constitutionally protected but claims that the extent of that protection is unclear, thus implying that it is unnecessary to look too closely at the restrictions on speech at issue in this case. I disagree. In this Circuit, it is clear that nude erotic dancers are entitled to full First Amendment protection for the expressive messages conveyed in their dancing. Kev, Inc. v. Kitsap County, 793 F.2d 1053, 1058 (9th Cir.1986).
 
 
 54
 I also disagree with the majority that the ten foot set-back at issue in this case is content-neutral as a matter of law. A regulation on constitutionally protected speech is content-neutral only if it is justified without reference to the content of the regulated speech. City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Kent's ordinance requires that all entertainers perform on a stage at least two feet above the patron seating area, and that no performer may dance any closer than ten (10) feet from any patron. The majority concludes that this law is content-neutral because it is not content-based "on its face."
 
 
 55
 This determination obviously begs the question at issue here: what is the content of the message communicated by the table dancer, as opposed to the stage dancer? If it is the same message--only magnified by proximity--then the majority is correct. If, however, stage dancers and table dancers communicate different expressive content in their respective messages, then summary judgment was improper. Appellants argue that the ordinance on its face bans certain forms of communication because it bars close physical proximity between dancers and patrons. They assert that proximity itself--the distance, or lack thereof, between the dancer and the patron--is integral to the message conveyed by table dancing. This message is entirely different, they contend, than the message conveyed by stage dancers.
 
 
 56
 In support of this contention, appellants proffered the testimony of cultural anthropologist Judith Hanna, a Senior Research Scholar at the University of Maryland. Hanna is the author of four books and approximately 80 scholarly articles on the anthropology of dance as non-verbal communication. She has conducted extensive fieldwork in exotic dance establishments as well as interviews with dancers and patrons. Hanna asserts that table dancers seek to send a message that is entirely different from that sent by stage dancers:
 
 
 57
 The message of the table dancer is personal interest in and understanding of the customer.... The entertainer creates an illusion of concern and availability for the customer and seeks to effect a transformation in the patron's feelings. Some customers get the personal attention of an attractive female who would not otherwise related to them or "give them the time of day;" some customers are reminded of what is to be desired.
 
 
 58
 Hanna concluded that close proximity between the dancer and the patron is an integral and essential part of the message itself. This is so, according to Hanna, not only because of the message of personal interest sent by the dancer's physical presence but also by other nonverbal communication that is only possible in close quarters. Specifically, Hanna testified that "proximity permits eye contact and awareness of indicators of attraction and satisfaction such as the mouth position, eye brightness, pupil dilation and expansion, facial color, breath, perfume, and body odors."
 
 
 59
 Appellants also introduced the declaration of Dr. Edward Donnerstein, the chair of the University of California-Santa Barbara Department of Communications who has studied the impact of distance on audience perceptions of erotic dance performances. Dr. Donnerstein, who was the lead social scientist called to give expert testimony before former United States Attorney General Edwin Meese's Commission on Pornography, concluded that proximity is not merely an incidental component of erotic dance but is integral to the message itself. He concluded that
 
 
 60
 The relational and erotic communication sought to be communicated by erotic dance performance is significantly and substantially effected (sic), reduced, and degraded by the requirement that performers be separated from their intended audience by a minimum distance of ten (10) feet.
 
 
 61
 Both Hanna and Donnerstein contrasted the message sent by physical closeness with that sent by the distance imposed by stage dancing, which, Hanna testified, transmits an entirely different signal: "coldness and impersonality." Appellants contend, with the support of their experts' declarations, that stage dancing communicates "the remoteness of the 'unreachable' object of desire" through its use of distance. Appellants, by producing these declarations, have created a material question of fact regarding whether table dancing is, as the district court and the majority conclude, merely stage dancing at a "louder volume," or whether it is an altogether different form of expression that depends upon proximity, and communicates a different and particular content.
 
 
 62
 To the extent that a reasonable trier of fact might conclude that table dancing and stage dancing are qualitatively distinct forms of expression, the ordinance is itself facially content-based. Moreover, evidence was adduced by appellants that Kent banned proximity precisely because it wants to constrain dancers from doing the very things that according to appellants' experts are essential to the message-chiefly getting close enough to the patrons so that they can communicate the message in the form that only table dancing permits.
 
 
 63
 Given the circumstances set forth above, the factual issue created by appellants' expert testimony is one for a jury. It was not appropriate for the district court or this court to substitute its own views regarding the purpose and effect of table dancing and decide as a factual matter the content of the message conveyed by that form of expressive communication. Accordingly, I would reverse the district court's grant of summary judgment.
 
 
 
 [1]
 The Supreme Court has determined that conduct is expressive when the following two factors are present: (1) intent to convey a particularized message; and (2) a substantial likelihood that the message will be understood by those receiving it. Spence v. Washington, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)
 
 
 [2]
 See also Schad v. Mount Ephraim, 452 U.S. 61, 66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (stating that "nude dancing is not without its First Amendment protections"); Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (noting that nude barroom dancing may involve only the "barest minimum of protected expression" which "might be entitled to First and Fourteenth Amendment protection "under some circumstances.")
 
 
 [3]
 Justice Scalia, concurring, determined that because the statute did not regulate nude dancing in particular but instead regulated public nudity in general, the law was not specifically directed at expression and therefore was not subject to First Amendment scrutiny at all. Barnes, 501 U.S. at 572, 111 S.Ct. 2456 (Scalia, J., concurring). Justice Souter, concurring, accorded a low-level of First Amendment protection to nude dancing, noting that "society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate." Barnes, 501 U.S. at 584, 111 S.Ct. 2456 (Souter, J., concurring) (citing Young, 427 U.S. at 70, 96 S.Ct. 2440)). Dissenting Justice White, joined by Justices Marshall, Blackmun, and Stevens, argued for full First Amendment protection for nude dancing. Barnes, 501 U.S. at 593, 111 S.Ct. 2456 (White, J., dissenting)
 
 
 [4]
 "[V]alidating a regulation of expressive conduct ... in the last analysis is little, if any, different from the standard applied to time, place or manner restrictions." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 298, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Under the standard set out in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), a regulation of symbolic expression is sufficiently justified if it: (a) is within the constitutional power of government; (b) furthers an important or substantial governmental interest unrelated to the suppression of expression; and (c) the incidental restriction on First Amendment freedoms is no greater than essential to the furtherance of that interest. Id. at 377, 88 S.Ct. 1673. The Ninth Circuit frequently cites both tests when analyzing regulations of adult entertainment. See, e.g., Walnut Properties, Inc. v. City of Whittier, 808 F.2d 1331, 1334-35 (9th Cir.1986)("Walnut I "); Kev, 793 F.2d at 1058-59 & n. 3 (9th Cir.1986)
 
 
 [5]
 Chemerinsky, Constitutional Law, § 11.3.4.4., p. 840 (1997)
 
 
 [6]
 Equal protection cases may provide some guidance in this regard. See, e.g, Village of Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 267-68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (allowing courts to consider "contemporary statements by members of the decisionmaking body" as evidence of sudden changes in policy or departure from normal procedures)
 
 
 [7]
 Kent's 1982 study also indicates an intent to assimilate rather than eliminate adult uses: "The City of Kent seeks to assimilate adult uses into the overall urban fabric with the least adverse impact to the business and residential environments." City of Kent Planning Dept., Adult Use Zoning Study 41 (1982). "A secondary objective is to discuss the ability of the City to provide services--primarily protective services--based on alternative locational requirements for adult uses." Id
 
 
 [8]
 We note that, according to Appellants' own evidence, an ordinance imposing a distance requirement any greater than six inches would effectively ban table dancing. The declaration of Appellants' expert cultural anthropologist defines table dancing as a dance performed in front of an audience at a distance of one to six inches
 
 
 [9]
 The Ladue Court noted, "[r]esidential signs are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute. Even for the affluent, the added costs in money or time of taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a handheld sign may make the difference between participating and not participating in some public debate." Ladue, 512 U.S. at 57, 114 S.Ct. 2038. The Court also noted that "Ladue's ordinance covers even such absolutely pivotal speech as a sign protesting an imminent governmental decision to go to war." Id. at 54, 114 S.Ct. 2038 (internal citations omitted)
 
 
 [10]
 The court elaborated on this point: "While selling T-shirts is a unique form of expression in the sense that serving message-bearing raviolis or preaching on street corners in a Donald Duck voice would be unique, it does nothing to make the message uniquely significant or effective." One World, 76 F.3d at 1015
 
 
 [11]
 Traditional public forums are "places which by long tradition or government fiat have been devoted to assembly and debate." Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Although in Acorn, we did not decide whether traffic-filled intersections should be considered public forums, we nevertheless applied public forum analysis to the case. Acorn, 798 F.2d at 1267
 
 
 [12]
 Appellants allege that, after a four-foot setback requirement was effectuated in Bellevue, the average number of dancers per week dropped from fifty to twelve, and thirty-eight dancers quit their jobs. Appellants also noted that "few if any" patrons purchased table dances
 
 
 [13]
 In other words, Spokane Arcade clarified that the scope of permissible economic analysis is whether one is permitted to enter or participate in the market in the first instance. Id. "Even if the costs of compliance were so great that [appellants] would be forced out of business, the ordinance[ ] do[es] not pose any intrinsic limitation on the operation of the [business]." Id. at 667