GRABER, Circuit Judge,
with whom THOMAS, Chief Judge, and McKEOWN, Circuit Judge,
join, concurring:
I concur fully in the majority opinion. I write separately only to state that, even if we assume that the Second Amendment applied to the carrying of concealed weapons in public, the provisions at issue would be constitutional. Three of our sister circuits have upheld similar restrictions under intermediate scrutiny. Such restrictions strike a permissible balance between “granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets.” Woollard v. Gallagher, 712 F.3d 865, 881 (4th Cir. 2013); see also Drake v. Filko, 724 F.3d 426, 431-32 (3d Cir. 2013) (assuming that the Second Amendment applies and upholding New Jersey’s “justifiable need” restriction on carrying handguns in public); Kachalsky v. County of Westchester, 701 *943 F.3d 81, 89, 97 (2d Cir. 2012) (assuming that the Second Amendment applies and upholding New York’s “proper cause” restriction on the concealed carrying of firearms). If restrictions on concealed carry of weapons in public are subject to Second Amendment analysis, we should follow the approach adopted by our sister circuits.
Judge Silverman’s dissent acknowledges the “significant, substantial, and important interests in promoting public safety and reducing gun violence.” (Dissent at 956.) He contends, though, that Defendants have failed to demonstrate “a reasonable fit” between the challenged licensing criteria and the government’s objectives. (Dissent at 956-57.) I disagree.
Judge Silverman points to evidence cited by two amici “showing that concealed-carry license holders are disproportionately less likely to commit crimes ... than the general population.” (Dissent at 957-58 - (citing Amicus Brief for the Governors of Texas, Louisiana, Maine, Mississippi, Oklahoma, and South Dakota at pp. 10-15;. and Amicus Brief for International Law Enforcement Educators and Trainers Association, et al., at pp. 22-26.)) There are, however, at least two reasons to question the relevance of those studies.
First, even accepting Judge Silverman’s premise, lawmakers are entitled to weigh the severity of the risk as well as the likelihood of its occurrence. Indeed, examples abound of “law-abiding citizens” in the seven states studied who place the public safety in jeopardy. In Florida, a state touted in the second of the cited amicus briefs, a “law-abiding” holder of a concealed-weapons permit shot and killed another person in 2014 in a movie theater after an argument over texting and popcorn. Ami-cus Brief for the Law Center to Prevent Gun Violence and Marin County Sheriff Robert Doyle In Support of Appellees’ Petition for Rehearing En Banc at 13. Two years earlier, another concealed-carry permit holder in Florida fatally shot someone after an argument over loud music in a gas station’s parking lot. Id. In Arizona, a qualified handgun carrier shot 19 people, including a congresswoman and a federal judge, outside a supermarket in 2011. Id. Those shooters all were legally entitled to carry their concealed firearms, which they used to kill others. Sadly, those incidents are not anomalies. Nationwide, since May 2007, concealed-carry permit holders have shot and killed at least 17 law enforcement officers and more than 800 private citizens — including 52 suicides. Concealed Carry Killers, Violence Policy Center, www.concealedcarrykillers.org (last visited Apr. 6, 2016). Thus, even if we assume that each and every one of those tragedies was less likely to occur because of the shooter’s prior status as a “law-abiding citizen,” that does not mean that a state legislature’s regulation of concealed carry fails to address the problem in a reasonable way.
Second, to the extent that concealed-carry license holders are, in fact, less likely to commit crimes, their relative peacefulness may result from (and not exist in spite of) the restrictions that are disputed in this case. For example, in Delaware, five upstanding citizens must swear that carrying a concealed deadly weapon is necessary for the protection of the applicant, the applicant’s property, or both. 11 Del. Code Ann. § 1441(a)(2). In Maryland, the applicant must show that he or she has a “good and substantial reason to wear, carry, or transport a handgun.” Md. Code Ann., Pub. Safety § 5-306(a)(6)(i). In Hawaii, a concealed-carry permit may be issued only “[i]n an exceptional case, when an applicant shows reason to fear injury to the applicant’s person or property.” Haw. Rev. Stat. § 134-9(a). In New York, a person seeking a license to carry a concealed handgun must show “proper cause,” N.Y. *944 Penal Law § 400.00(2)©; and, in New Jersey, the applicant must demonstrate “that he has a justifiable need to carry a handgun,” N.J. Stat. Ann. § 2C:58-4. Rhode Island and the District of Columbia require the applicant to show that he or she is a “suitable person” and has a “reason,” such as “fear[ing] an injury to his or her person or property,” for carrying a firearm. Mass. Gen. Laws ch. 140, § 131(d); 1956 R.I. Gen. Laws § 11-47-11(a); D.C. Code § 22-4506(a). In other words, it may be the heightened restrictions on concealed-carry permits in many jurisdictions — the very provisions challenged in this case — that cause statistically reduced violence by permit holders.
Of equal importance, the studies to which Judge Silverman alludes are not the only side of the story. Much respected evidence is to the contrary. Several studies suggest that “the clear majority of states” that enact laws broadly allowing concealed carrying of firearms in public “experience increases in violent crime, murder, and robbery when [those] laws are adopted.” John J. Donohue, The Impact of Concealed-Carry Laws, in Evaluating Gun Policy Effects on Crime and Violence 287, 320 (2003), available at http://www. brookings.edu/=/media/press/books/2003/ evaluatinggunpolicy/evaluatinggunpolicy_ chapter.pdf; see also Jens Ludwig, Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data, 18 Int’l Rev. L. & Econ. 239, 239 (1998) (noting that laws broadly allowing concealed carrying of weapons “have resulted, if anything, in an increase in adult homicide rates”), available at http://home. uchicago.edu/ludwigj/papers/IJLE-ConcealedGunLaws-1998.pdf; David McDowall et al., Easing Concealed Firearms Laws: Effects on Homicide in Three States, 86 J. Crim. L. & Criminology 193, 202-03 (1995) (noting that, in the aftermath of relaxed concealed-carry laws, “firearms homicides increased” while “homicides without guns remained steady,” and concluding that weaker firearms regulation may “raise levels of firearms murders”), available at http://scholarly commons.law.northwestern.edu/cgi/view content.cgi?article=6855& context=jclc.
Similarly, some studies suggest that “policies to discourage firearms in public may help prevent violence.” McDowall et al., Easing Concealed Firearms Laws at 203. A study of prisoners incarcerated for gun offenses, for example, found that two-thirds of those prisoners “reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun.” Philip Cook et al., Gun Control After Heller: Threats and Sideshows From a Social Welfare Perspective, 56 U.C.L.A. L. Rev. 1041,1081 (2009). The study continues:
Currently, criminals use guns in only about 25 percent of noncommercial robberies and 4 percent of assaults. If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.
Id. (footnote omitted).
Clearly, social scientists disagree about the practical effect of modest restrictions on concealed carry of firearms. In the face of that disagreement, and in the face of inconclusive evidence, we must allow the government to select among reasonable alternatives in its policy decisions. As the Second Circuit explained, in upholding a requirement that an applicant show an objective threat to personal safety, or a special need for self-protection, to obtain a concealed-carry license for a handgun:
To be sure, we recognize the existence of studies and data challenging the rela *945 tionship between handgun ownership by lawful citizens and violent crime. We also recognize that many violent crimes occur without any warning to the victims. But New' York also submitted studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces. It is the legislature’s job, not ours, to weigh conflicting evidence and make policy judgments.
Kachalsky, 701 F.3d at 99; see also Woollard, 712 F.3d at 876-82 (detailing the reasons why Maryland’s law, requiring a good and substantial reason to carry a concealed firearm in public, advances the government’s important public safety objectives); Drake, 724 F.3d at 439 (noting that “conflicting empirical evidence ... does not suggest, let alone compel, a conclusion that the ‘fit’ between [a state’s] individualized, tailored approach and public safety is not ‘reasonable’ ”).
Defendants must show only that the regulation “promotes a ‘substantial government interest that would be achieved less effectively absent the regulation,’ ” not that the chosen regulation is the “least restrictive means” of achieving the government’s important interest. Fyock v. City of Sunnyvale, 779 F.3d 991, 1000 (9th Cir. 2015) (quoting Colacurcio v. City of Kent, 163 F.3d 545, 553 (9th Cir. 1998)); see also United States v. Marzzarella, 614 F.3d 85, 98 (3d Cir. 2010) (stating that the fit need only “be reasonable, not perfect”). In examining reasonableness, we “must accord substantial deference to the predictive judgments” of legislative bodies, Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), and the government must be allowed to experiment with solutions to serious problems, Jackson v. City of San Francisco, 746 F.3d 953, 966 (9th Cir. 2014) (citing City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)).
Finally, despite Judge Silverman’s argument to the contrary, California’s decision to confer permit discretion on its counties is not an arbitrary one. Localizing the decision allows closer scrutiny of the interests and needs of each community, increasing the “reasonable fit” between the level of restriction and local conditions and decreasing the extent of the restriction that otherwise would apply, statewide, in places that do not require it. Similarly, localizing the decision allows more careful and accurate consideration of each individual’s license application. California entrusts the decision-making responsibility to local law enforcement officials because they are best positioned to evaluate the potential dangers that increasing or decreasing concealed carry would have in their communities. This structure allows for a nuanced assessment of the needs of each locality in processing applications for concealed carry. In short, California’s decision to place licensing in local hands is itself reasonable.
In sum, even if the Second Amendment applied to concealed carry of firearms in public, the challenged laws and actions by Defendants survive heightened scrutiny. No constitutional violation occurred.