No. 2--04--0255         

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

XLP CORPORATION, d/b/a Dancers, ) Appeal from the Circuit

MICHAEL J.
 CHRISTOFALOS and DANNY
 ) Court of Lake County.

CHRISTOFALOS,
 d/b/a Baby Dolls, and )

GEORGE STANTOPOLOUS, d/b/a Video Magic, )

)

Plaintiffs-Appellants, ) 

)

) No. 98--CH--1106

)

THE COUNTY OF LAKE, ) Honorable

) Raymond J. McKoski,

Defendant-Appellee. ) Judge, Presiding.

JUSTICE GROMETER delivered the opinion of the court:

Plaintiffs, XLP Corporation, Michael J. Christofalos, Danny Christofalos, and
 George Stantopolous, filed an action in the circuit court of Lake County alleging that an ordinance enacted by Lake County (the county or defendant) that regulated adult establishments was unconstitutional.  Following a bench trial, the circuit court entered judgment in defendant's favor.  Plaintiffs now appeal, and, for the reasons that follow, we affirm.

I. BACKGROUND

In 1998, Lake County enacted an ordinance regulating adult uses.  See Lake County Ordinance 6:1--15 (eff. February 10, 1998).  In response to a court decision that called into question the constitutionality of the ordinance (see 
Wisconsin Vendors, Inc. v. Lake County
, No. 99--C--8340 (N.D. Ill. 2003)), it was amended in 2001 (see Lake County Ordinance 6:1--15 (eff. October 9, 2001)).  The purposes of the ordinance and its amendment were set forth by the county in preambles to the two enactments.  The preamble to the original ordinance contains an extensive statement listing problems that the county board found were caused by adult uses, including crime, the deterioration of residential neighborhoods, the instability of nearby commercial and business uses, a "dehumanizing and distracting influence" upon young people, and the spread of diseases.

As amended, the ordinance set forth a number of conditions pertaining to adult businesses.  Among its provisions are the following: (1) adult uses must obtain a license; (2) establishments may operate only from noon to midnight; (3) establishments must close on Sundays and state holidays; (4) employees are forbidden from appearing nude; (5) straddle dances are prohibited; and (6) exterior signs are limited to 32 square feet.  Adult cabarets are subject to additional restrictions, including: (1) performances are limited to a stage raised at least 18 inches above the patron seating area and separated from it by 8 feet; (2) the establishment must be lit such that all items within it are plainly visible; (3) dancers are forbidden from receiving tips directly from customers; (4) tips must be placed in a receptacle after the completion of the performance; and (5) no person under the age of 21 is allowed on the premises.  

In response, plaintiffs initiated the instant action, alleging violations of their rights under the first and fourteenth amendments to the United States Constitution.  U.S. Const., amends. I, XIV.  The cause proceeded to a bench trial, following which the circuit court entered judgment in defendant's favor.  Due to the fact that a number of the issues are relatively discrete and that much evidence is relevant only to certain portions of this opinion, we will not set forth the evidence adduced at trial here.  Instead, we will discuss it as we analyze the issues plaintiffs press in this appeal.

II. ANALYSIS

Plaintiffs raise the following issues.  First, they argue that the licensing scheme contained within the ordinance constitutes an unlawful prior restraint.  Second, they contend that Lake County has failed to demonstrate that the ordinance is justified by the purported need to control adverse secondary effects.  In this argument, plaintiffs attack the ordinance as a whole.  While they do at times mention certain restrictions contained in the ordinance, they do not focus on subparts of the ordinance.  Accordingly, we will analyze plaintiffs' argument as a challenge to the constitutionality of the entire ordinance.  Third, they assert that the age restrictions contained in the ordinance are invalid.

A. Prior Restraint 

Plaintiffs first allege that the licensing provision in the ordinance is an unconstitutional prior restraint.  They argue that the scheme "permits unbridled discretion in determining whether to allow permitted expression to occur."  According to plaintiffs, this discretion is found in section 7(E) of the ordinance, which states that the applicant's failure "to give any information reasonably relevant to the investigation of the application *** shall constitute an admission by the applicant that the applicant is ineligible for an Adult Establishment License" (Lake County Ordinance 6:1--15 (eff. October 9, 2001)).  Plaintiffs contend that this provision results in unbridled discretion because "there is no limitation whatsoever on the 'information reasonably relevant to the application.' "

Prior restraints on speech are strongly disfavored.  
People v. Sequoia Books, Inc.
, 127 Ill. 2d 271, 281 (1989).  Nevertheless, a properly limited licensing regulation is not unconstitutional.  A licensing regulation that places unbridled discretion in the hands of the decision maker to permit or deny speech violates the first amendment.  
City of Lakewood v. Plain Dealer Publishing Co.
, 486 U.S. 750, 757, 100 L. Ed. 2d 771, 782, 108 S. Ct. 2138, 2144 (1988).  To pass constitutional muster, a licensing scheme must contain specific guidelines regarding how the decision to grant or deny a license is to be made.  
International Union of Operating Engineers, Local 150 v. Village of Orland Park
, 139 F. Supp. 2d 950, 960 (N.D. Ill. 2001).  On this issue, the burden of proof lies with the government (
International Union of Operating Engineers, Local 150
, 139 F. Supp. 2d at 960), and our review of constitutional issues is 
de novo
 (
Weinberg v. City of Chicago
, 310 F.3d 1029, 1035 (7th Cir. 2002)).

We do not read the provision of section 7(E) about which plaintiffs complain as placing unbridled discretion with those responsible for making the licensing decision.  Certainly, if the only guidance given by the ordinance were that an applicant must provide "any information reasonably relevant to the investigation of the application," there would be little to limit the discretion of the decision maker.  However, section 8(A) of the ordinance, titled "Standards for Issuance or Denial of License," provides ample detail as to what is relevant to the processing of the application.  Section 8(A) limits the inquiry to whether persons listed in the application are of a specified minimum age; whether the applicant or the applicant's spouse or a person with whom the applicant is cohabiting has had a similar license revoked within the past 12 months; whether the establishment conforms with applicable building, zoning, health, and safety codes; and whether the applicant has confirmed in writing that he or she has read the ordinance and will comply with it.  Some additional information must be disclosed pursuant to section 6, which pertains to the nature of the business and the background of the applicant.  However, outside of the requirement that this information be supplied, the information required by section 6 does not form the basis of whether a license may be issued under section 8(A).

Thus, any apparent discretion vested by section 7(E) is limited to the specific criteria set forth in other sections of the ordinance.  Information is reasonably relevant to the application only if it relates in some substantial way to the requirements for issuing the license.  Relevance is not so esoteric and amorphous a concept that it would allow the decision maker to demand virtually anything from an applicant.  Moreover, section 7(G) of the ordinance makes such decisions subject to judicial review.  See Lake County Ordinance 6:1--15 (eff. October 9, 2001).  We note that other courts have upheld provisions substantially similar to the one at issue here.  See 
Brownell v. City of Rochester
, 190 F. Supp. 2d 472, 494 (W.D.N.Y. 2001)
; 
Centaur, Inc. v. Richland County
, 301 S.C. 374, 380, 392 S.E.2d 165, 170 (1990)
.

Accordingly, we hold that Lake County's adult-use ordinance does not vest the decision maker with "unbridled discretion" to grant or deny a permit to operate an adult establishment.  We therefore reject plaintiffs' argument on this point.

B. Secondary Effects

Plaintiffs next argue that the ordinance is not a legitimate attempt to control the secondary effects of adult establishments.  This argument presents an issue that has often been litigated in the courts of this nation: when and to what extent may the government regulate an adult use?  Resolution of this issue is complicated by courts' inability to articulate a clear set of principles to govern cases such as these.  The decision in 
City of Los Angeles v. Alameda Books, Inc.
, 535 U.S. 425, 152 L. Ed. 2d 670, 122 S. Ct. 1728 (2002), for example, did not command a majority of the Supreme Court.  The plurality opinion was joined by Justice Kennedy; however, he rejected the previously relatively well-established notion that legislation targeting secondary effects is content-neutral.  
Alameda Books, Inc.
, 535 U.S. at 448, 152 L. Ed. 2d at 689, 122 S. Ct. at 1741 (Kennedy, J., concurring).  
Likewise, in 
Pap's A.M. v. City of Erie
, 553 Pa. 348, 358, 719 A.2d 273, 278-79 (1998), 
overruled
, 
City of Erie v. Pap's A.M.
, 529 U.S. 277, 146 L. Ed. 2d 265, 120 S. Ct. 1382 (2000), the Pennsylvania Supreme Court eschewed reliance upon 
Barnes v. Glenn Theater Inc.
, 501 U.S. 560, 115 L. Ed. 2d 504, 111 S. Ct. 2456 (1991), despite the similarity between 
Barnes
 and the case before it.  That court observed that, "aside from the agreement by a majority of the 
Barnes
 Court that nude dancing is entitled to some First Amendment protection, we can find no point on which a majority of the 
Barnes
 Court agreed."  
Pap's A.M.
, 553 Pa. at 358, 719 A.2d at 278.  Similarly, 
Young v. American Mini-Theaters, Inc.
, 427 U.S. 50, 49 L. Ed. 2d 310, 96 S. Ct. 2440 (1976), resulted in a badly fractured court.  In short, guidance from the Supreme Court on this issue has been somewhat less than clear.  Therefore, we must begin our analysis by setting forth the law as best we can derive it from applicable precedent.  

Not surprisingly, given the somewhat nebulous state of the case law, both parties' briefs are a bit confused on this issue.  Central to their disagreement, however, is what evidence is required to support an enactment such as the ordinance at issue here.  Similarly, the parties disagree as to how much deference we owe a legislative body that enacts such an ordinance.  Plaintiffs assert that we owe no deference to the Lake County Board.  Defendant, on the other hand, at times suggests that so long as the evidence supporting the enactment was of a sort that could be reasonably relied on by the county board, the ordinance is not problematic.  Neither of these two extremes represents the law, although both represent portions of the analysis that we must undertake.  We conduct 
de novo
 review of constitutional questions (
Weinberg
, 310 F.3d at 1035); however, with regard to questions of fact, we defer to the trial court so long as its findings are not contrary to the manifest weight of the evidence.  See 
Ward v. Rock Against Racism
, 491 U.S. 781, 802, 105 L. Ed. 2d 661, 682, 109 S. Ct. 2746, 2759 (1989) ("In view of these findings, which were not disturbed by the Court of Appeals, we must conclude that the city's guideline has no material impact on any performer's ability to exercise complete artistic control over sound quality").

The entire analysis involves three steps.  First, we must determine whether the ordinance is a total ban on speech or simply a time, place, or manner restriction.  
City of Renton v. Playtime Theaters, Inc.
, 475 U.S. 41, 46, 89 L. Ed. 2d 29, 37, 106 S. Ct. 925, 928 (1986).  Second, we must decide whether the ordinance is content-based or content-neutral.  
City of Renton
, 475 U.S. at 47-49, 89 L. Ed. 2d at 37-39, 106 S. Ct. at 928-30.  If the ordinance is found to be content-based, it is subject to strict scrutiny; if content-neutral, we proceed to the next step.  
Alameda Books, Inc.
, 535 U.S. at 434, 152 L. Ed. 2d at 680, 122 S. Ct. at 1733.  The third prong requires that we ask whether the ordinance is designed to serve a substantial government interest while leaving open reasonable alternative avenues of communication.  
City of Renton
, 475 U.S. at 50, 89 L. Ed. 2d at 39, 106 S. Ct. at 930.

In this case, the first step does not require significant analysis.  The ordinance does not ban all adult speech.  Instead, it limits the hours adult businesses may be open, requires licenses, sets a minimum age for employees and patrons, puts conditions upon how such speech may be communicated, and imposes other similar requirements.  As it does not ban adult establishments altogether, it is properly analyzed as a time, place, or manner restriction.  See 
City of Renton
, 475 U.S. at 46, 89 L. Ed. 2d at 37, 106 S. Ct. at 928.  The parties do not seriously contest this prong.

The second prong concerns whether the ordinance is content-based or content-neutral.  
City of Renton
, 475 U.S. at 47-49, 89 L. Ed. 2d at 37-39, 106 S. Ct. at 928-30.  One might suppose that whether an ordinance is content-based would be determined by looking at the face of the ordinance and seeing what it purports to regulate; however, this is not the case.  Though it may seem peculiar, whether an ordinance is content-based is a matter of legislative intent.  See 
Alameda Books, Inc.
, 535 U.S. at 440-41, 152 L. Ed. 2d at 684, 122 S. Ct. at 1737, quoting 
City of Renton
, 475 U.S. at 47, 89 L. Ed. 2d at 37-38, 106 S. Ct. at 929 (emphasis omitted) (whether an ordinance is content-neutral "requires courts to verify that the 'predominate concerns' motivating the
 
ordinance 'were with the secondary effects of adult [speech], and not with the content of adult [speech]' ").  As the Seventh Circuit Court of Appeals observed, "Whatever the label, 
Renton's
 second step is best conceived as an inquiry into the purpose behind an ordinance rather than an evaluation of the ordinance's form." 
R.V.S., L.L.C. v. City of Rockford
, 361 F.3d 402, 407 (7th Cir. 2004).

At this stage, the inquiry is highly deferential to the legislative body that enacted the ordinance.  Because this inquiry concerns only the motivation of the enacting body, it is sufficient that a defendant set forth a basis upon which it reasonably could have relied to justify the ordinance without reference to the speech.  
Kev, Inc. v. Kitsap County
, 793 F.2d 1053, 1058-59 (9th Cir. 1986).  This is undeniably a difficult standard for a plaintiff to overcome.  
Colacurcio v. City of Kent
, 163 F.3d 545, 551-52 (9th Cir. 1998).  That a plaintiff face a high burden here is appropriate, as inquiries into legislative intent are often problematic.  Notably, in 
Pap's A.M.
, 529 U.S. at 296, 146 L. Ed. 2d at 282, 120 S. Ct. at 1394, the Supreme Court stated:

 "Even if the city thought that nude dancing at clubs like Kandyland constituted a particularly problematic instance of public nudity, the regulation is still properly evaluated as a content-neutral restriction because the interest in combating the secondary effects associated with those clubs is unrelated to the suppression of the erotic message conveyed by nude dancing."

Thus, absent extraordinary circumstances, it is clear that an ordinance that seeks to regulate adult speech will be deemed content-neutral.

We recognize that the Supreme Court recently split regarding the nature of this inquiry.  While the plurality in 
Alameda Books, Inc.
, 535 U.S. at 434, 152 L. Ed. 2d at 680, 122 S. Ct. at 1733, adhered to the test as set forth in 
City of Renton
, Justice Kennedy concurred and set forth a somewhat different analysis.  He rejected the distinction between content-based and content-neutral regulations.  
Alameda Books, Inc.
, 535 U.S. at 448, 152 L. Ed. 2d at 689, 122 S. Ct. at 1741 (Kennedy, J., concurring).  Nevertheless, he wrote, if a city can decrease adverse secondary effects while leaving the quantity and accessibility of the speech substantially the same, it may take such steps, "even if the measure identifies the problem outside [of an establishment] by reference to the speech inside--that is, even if the measure is in that sense content based."  
Alameda Books, Inc.
, 535 U.S. at 445, 152 L. Ed. 2d at 687, 122 S. Ct. at 1739 (Kennedy, J., concurring).  To withstand constitutional scrutiny, "[t]he 
purpose
 and effect of a[n] *** ordinance must be to reduce secondary effects and not to reduce speech."  (Emphasis added.)  
Alameda Books, Inc.
, 535 U.S. at 445, 152 L. Ed. 2d at 687, 122 S. Ct. at 1740 (Kennedy, J., concurring).  Thus, though his analysis differed from the plurality's, the purpose of a regulation remains an issue.  Moreover, as under the traditional test followed by the plurality, Justice Kennedy concluded that intermediate scrutiny was appropriate.  
Alameda Books, Inc.
, 535 U.S. at 447, 152 L. Ed. 2d at 689, 122 S. Ct. at 1741 (Kennedy, J., concurring).

Thus, under the reasoning of both Justice Kennedy and the plurality, the purpose of the ordinance must be assessed.  Although the contours of the inquiry into purpose are not clear under Justice Kennedy's analysis (see 
Alameda Books, Inc.
, 535 U.S. at 447, 152 L. Ed. 2d at 689, 122 S. Ct. at 1741 (Kennedy, J., concurring) ("The ordinance may be a covert attack on speech, but we should not presume it to be so.  In the language of our First Amendment doctrine it calls for intermediate and not strict scrutiny, as we held in 
Renton
")), they are clear under the traditional analysis (see 
Ward
, 491 U.S. at 791, 105 L. Ed. 2d at 675, 109 S. Ct. at 2754).  So long as the regulation can be justified without reference to the content of the speech, it is content-neutral.  
Ward
, 491 U.S. at 791, 105 L. Ed. 2d at 675, 109 S. Ct. at 2754. 
 In other words, if there was some basis upon which the legislative body reasonably could have relied, for the purpose of the 
Renton
 analysis, the regulation is content-neutral.  
Kev, Inc.
, 793 F.2d at 1058-59.

With these standards in mind, we will now address the issue of the purpose of the ordinance and whether it is content-based or content-neutral.  At this stage of the inquiry, it must be remembered, all that is required is a basis upon which the board reasonably could have relied in enacting the ordinance.  
Kev, Inc.
, 793 F.2d at 1058-59.  Plaintiffs contend that there was "absolutely no evidence" that could have supported enacting either the original or the amended ordinance.  This proposition is simply untrue.  As plaintiffs acknowledge, board members "were given a summary of some *** studies by their counsel."  Further, plaintiffs admit that there were studies to which the board referred.  They complain, however, that there is no evidence that those materials were actually considered or even read by individual board members.  Plaintiffs do not cite any authority to support their contention that board members must read a study rather than hear a summary of it.  In the course of making this portion of the argument, they cite only 
Pleasureland Museum, Inc. v. Beutter
, 288 F.3d 988 (7th Cir. 2002), which is inapposite, as the portion of the case that plaintiffs 
appear to
 rely upon was decided under the third prong of the 
Renton
 analysis.  See 
Pleasureland Museum, Inc. v. Beutter
, 288 F.3d at 1002.  We say "appear to" because plaintiffs have not provided pinpoint citations to the material upon which they rely in this source, which waives any reliance they would place upon it.  See 
Chicago Title & Trust Co. v. Weiss
, 238 Ill. App. 3d 921, 927-28 (1992) (noting that violation of Supreme Court Rule 341(d), which incorporates Supreme Court Rule 6, can result in waiver of an argument).  We also note that, when the board amended the ordinance, it heard testimony from representatives of Lake County's law enforcement community regarding undercover operations that resulted in arrests for prostitution.

In sum, as noted above, under this prong of the test, plaintiffs bear a high burden.  See 
Colacurcio
, 163 F.3d at 551-52.  Once the county set forth a basis upon which it reasonably could have relied in enacting the ordinance, it became incumbent upon plaintiffs to show that the actual purpose behind the ordinance was to suppress speech.  Simply criticizing the information that the county relied on is not sufficient, so long as that evidence provided a reasonable basis for the county's action.  We will therefore review the ordinance as content-neutral.  We now turn to the third prong of the test, which is not as deferential to the government.

The third prong asks whether the ordinance is designed to serve a substantial government interest while leaving open reasonable alternative avenues of communication.  
City of Renton
, 475 U.S. at 50, 89 L. Ed. 2d at 39, 106 S. Ct. at 930.  This prong requires that the government demonstrate a connection between the speech that is regulated and the secondary effects it purportedly causes.  
Alameda Books, Inc.
, 535 U.S. at 441, 152 L. Ed. 2d at 684, 122 S. Ct. at 1737.  It is at this stage that a court first must evaluate and weigh the evidence regarding a link between the speech and its secondary effects.  
Alameda Books, Inc.
, 535 U.S. at 441, 152 L. Ed. 2d at 684, 122 S. Ct. at 1737.  That the ordinance must be designed to serve a substantial government interest does not mean that the government must employ the least restrictive means available to address the problem.  
Mitchell v. Comm'n on Adult Entertainment Establishments
, 10 F.3d 123, 137 (3rd Cir. 1993). 

The evidentiary burden shifts between the parties.  Initially, a municipality need only set forth evidence it " 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest."  
Alameda Books, Inc.
, 535 U.S. at 438, 152 L. Ed. 2d at 683, 122 S. Ct. at 1736, quoting 
City of Renton
, 475 U.S. at 51, 89 L. Ed. 2d at 40, 106 S. Ct. at 931.  Then, the party challenging the ordinance is allowed an opportunity to "cast direct doubt on this rationale."  
Alameda Books, Inc.
, 535 U.S. at 438, 152 L. Ed. 2d at 683, 122 S. Ct. at 1736.  It may do so either by showing that the government's evidence does not support its rationale or by setting forth countervailing evidence of its own.  
Alameda Books, Inc.
, 535 U.S. at 438-39, 152 L. Ed. 2d at 683, 122 S. Ct. at 1736.  If the challenger does not meet this burden, the inquiry ends and the government has met its burden.  
Alameda Books, Inc.
, 535 U.S. at 438-39, 152 L. Ed. 2d at 683, 122 S. Ct. at 1736.  If, however, the challenger succeeds in casting doubt on the government's purported rationale, the burden returns to the government to set forth additional evidence supporting its theory.  
Alameda Books, Inc.
, 535 U.S. at 439, 152 L. Ed. 2d at 683, 122 S. Ct. at 1736.  Note that at this stage, unlike the second, the evidence need not have been considered by the body that enacted the ordinance, because we are no longer concerned with legislative intent, but with the actual connection between the speech and its purported secondary effects.

A trial, of course, does not proceed in this manner; the burden of proof, and the ability to present evidence, does not shift back and forth.  Thus, the framework set forth in the preceding paragraph is probably more useful, and more adhered to, during pretrial dispositive motions.  In a trial, each party sets forth all of its evidence at once, with an opportunity for rebuttal.  Hence, in this case, evaluating the evidence in stages according to shifting burdens would be artificial.  Suffice it to say that both parties presented ample evidence to meet their burdens under the first two parts of the third prong.  There was ample evidence to support the county's rationale for the ordinance, and plaintiffs presented ample evidence to cast doubt on that rationale.  We will therefore evaluate the evidence in total under the third portion of the inquiry.  Given that it entails a full evaluation of all of the evidence, whichever party prevails at this stage also would have satisfied the earlier portions of this prong.

At trial, plaintiffs set forth the following evidence.  They first called Dr. Judith Hanna, who holds a Ph.D. in anthropology and whose area of expertise is nonverbal communication and the role of dance in society.  The trial court found that she could testify as an expert on "dance as related to anthropology."  Hanna testified that dance communicates a message and that exotic dance "meets the criteria of dance."  Use of space is a critical element of all dance, and often touch is an element as well.  She characterized nudity as the "punch line" of exotic dance and stated that nudity expresses a message.  Hanna described the history and origins of exotic dance.  Further, requiring that the stage be at least 18 inches off the ground and be separated by a three-foot high partition would affect the message conveyed by the dance by suggesting coldness, dislike, and distrust.  Provisions prohibiting tipping dancers directly would impede the feedback the dancers receive.  Hanna opined that adult establishments cause no adverse secondary effects.

Plaintiffs also presented the testimony of Bruce McLaughlin, a consultant to local governments on land use and planning issues.  He reviewed a number of studies that have been used by local governments to support the position that adult businesses cause adverse secondary effects.  In his opinion, the studies do not support this proposition.  McLaughlin testified that adult businesses cause neither decreases in property values nor increases in crime.  He criticized a report generated by the Lake County chief of police regarding the number of crimes occurring at adult businesses, because it made no comparison to crimes occurring at nonadult establishments.  He also noted that the report included occasions where the police visited an establishment on their own initiative just to see what was happening at the establishment.  Furthermore, the report did not establish that the reported crimes were actually connected to the adult businesses as opposed to something else nearby.

Michael Christofalos, who owns XLP Corporation, which operates "Dancers," testified that the club is open from 7 p.m to 3 a.m. on weekdays.  On weekends, it operates from 7 p.m. to 4 a.m.  The club does not serve alcohol.  The majority of the club's business occurs between 11 p.m. and closing.  Requiring the club to close at midnight would deprive it of 75% of its business.  The ordinance's requirements regarding the construction of the stage would limit the ability of patrons to see the dancers, and the requirement that dancers remain at least eight feet from the patrons would eliminate 75% of the club's seating.  He believed that he would not be able to stay in business in conformance with the ordinance.  He acknowledged that on one occasion, four dancers were arrested and convicted of prostitution.

Danny Christofalos, who operates "Baby Dolls," also testified.  He has owned Baby Dolls since 1996.  The club is open from 4 p.m. to 3 a.m on weekdays.  It closes at 4 a.m. on Saturdays and 1 a.m. on Sundays.  The majority of the club's business occurs after midnight, representing over 70% of its income.  The specifications regarding stage construction would impair patrons' ability to observe dancers perform.  Further, requiring dancers to stay eight feet away from patrons would eliminate much of the club's seating.  He testified that one of his employees had been convicted of prostitution, and one of solicitation, in January 2000.

Diana Lancaster, who has been employed as a dancer at Dancers for over five years, next testified.  She testified that when she dances on stage, it is an act during which she does attempt to communicate a message.  Disrobing is a component of her performance.  Being able to make eye contact with a patron is an important part of the performance, and eye contact is a means of communication.  Lancaster did state that she would be able to communicate the same message from a distance of eight feet.

The first witness called by the county was Theodore Johnson, a land-use consultant and planner.  Johnson testified that the intersections at which Baby Dolls and Dancers were located were attractive commercial properties; however, they had not been developed as would typically be expected.  He opined that the adult uses retarded development of these intersections.  Johnson also testified that he spoke to some land developers who stated that they were apprehensive about developing land near adult uses.  Johnson has worked with Costco for 12 years.  That company requires a provision in its leases that prohibits landlords from leasing or selling nearby properties to adult establishments.  

Next, the county called Kathy Kelly.  Since 1998, she has been the general manager of Forty-One News, an adult bookstore located adjacent to Baby Dolls.  Forty-One News contains a number of video booths.  A majority of the booths contain holes between them.  The booths used to contain waste baskets, but they had to be removed because customers were setting them on fire.  Although she stated that the rule that only one patron is allowed in a booth is no longer frequently violated, she acknowledged that she has to enforce the rule on a daily basis.  She also has to ask people to leave every day; however, she has not had to ask anyone to leave for solicitation of prostitution in about two years.  Kelly testified that the owner of  Forty-One News also owns a motel located next door.  Kelly manages the motel.  Jason Strong, an employee of Forty-One News, lived at the motel until he was arrested for murder.

Dr. Eric Kelly, who holds a law degree and a Ph.D. in public policy, next testified for the county.  He stated that he has performed studies and surveys regarding adult uses for various local government entities.  Dr. Kelly visited both Dancers and Baby Dolls.  At Baby Dolls, he observed a dancer wrap her breasts around a customer's face.  

Dr. Kelly testified that he has observed other adult establishments.  He believed that the best way to prevent unlawful physical contact between dancers and patrons is to keep the two apart.  He stated that short distance restrictions, such as an 18-inch restriction in place in Toledo, are too difficult to enforce.  He opined that anything shorter than an eight-foot restriction would allow at least some limited physical contact between patrons and dancers.  Dr. Kelly also opined that the restriction on tipping contained in the ordinance served to limit illegal activity.  Parenthetically, we note that several questions were posed to Dr. Kelly regarding whether certain portions of the regulations were "reasonably related" to preventing illegal activity.  We do not read his answers as the expression of a legal point; we take them simply as statements regarding causation.  Dr. Kelly stated that the studies upon which the county relied did support the ordinance.  He stated that the summary of the studies provided to the board was accurate.

Richard Eckenstahler, the chief of operations for the Lake County sheriff's department, testified as an expert on law enforcement.  He served as a highway patrolman from 1979 to 1986.  During this period, he was called to respond to complaints at adult uses approximately once a week or once every two weeks.  Most often, the complaints involved customer disputes or batteries.  In 1985, he participated in an undercover operation targeting prostitution at the Roman House, an establishment that is no longer in business, having been declared a public nuisance.  He chronicled other incidents, including the placement of dynamite on the roof of an adult establishment in the early 1980s; the beating of a patron by an employee of the club that became Dancers; two incidents of arson; and three undercover operations targeting prostitution at or near Baby Dolls or Dancers.  Additionally, an employee of Forty-One News was convicted of a murder that occurred in the adjacent motel.

Eckenstahler testified that from 1979 to 2001, 202 police reports were generated from incidents occurring at adult establishments in Lake County.  During the same period, there were 405 additional incidents at adult establishments that did not generate formal police reports.  He opined that the numbers of assaults, batteries, and sex-related crimes were "high and noteworthy."  Eckenstahler conducted a comparative study of adult uses and other establishments.  He tried to select busy bars and taverns that were located near the adult establishments and were of similar size and capacity.  He testified that the number of incidents at bars and taverns was less than at Baby Dolls and Dancers, despite the fact that the bars and taverns served alcohol while the two adult establishments did not.  Eckenstahler also opined that crimes at adult establishments are under-reported because victims do not want it known that they were at adult establishments.  He also believed that the licensing and regulation of adult establishments would be an effective tool for law enforcement in minimizing the criminal activity.

Andrea Usry, a Lake County sheriff's deputy, took part in an undercover operation in which she rented a room at the motel located next to Forty-One News.  The operation resulted in three arrests and one conviction for solicitation.  During this operation, she garnered information that led to the conviction of Jason Strong for murder.  She did acknowledge that she was asked to leave the area because she was believed to be a prostitute.  Usry also testified that the area around Baby Dolls was a problem area.  On one occasion, she was dispatched to the area and discovered two men engaged in sexual activity in a car.  On another occasion, she was called to Baby Dolls because one dancer had pulled a pair of scissors on another.  Also, she responded to an incident where a man was kicking a pregnant woman outside of Baby Dolls.  She acknowledged that she had no reason to believe that either person was affiliated with Baby Dolls or Forty-One News.  On still another occasion, she discovered a child unattended in a truck while his father was inside Forty-One News at 2 a.m.

Officer Cory Kelly testified that, on November 20, 2001, she was involved in an undercover reverse-sting operation.  She posed as a prostitute in the parking lot of Baby Dolls.  The operation lasted six hours and resulted in seven arrests and six convictions for solicitation of a sex act.  

The evidence was obviously conflicting, and each party made a considerable effort to diminish the credibility of the other's witnesses.  In a well-reasoned discussion of the third stage, the trial court found that the evidence fairly justified the enactment of the ordinance.  For the purpose of resolving this question, the trial court assumed that plaintiffs had succeeded in casting doubt on the county's evidence.  The trial court first noted the evidence of actual prostitution and solicitation convictions.  It then noted that the opinions of Dr. Hanna and McLaughlin were undermined by the fact that they were unaware that there had been convictions for prostitution at both Baby Dolls and Dancers.  McLaughlin expressly stated that the existence of prostitution convictions within the preceding five years would affect his opinion regarding whether the adult establishments caused adverse secondary effects.  The trial court credited the testimony of Officer Kelly and Eckenstahler regarding a higher incidence of crime occurring at the establishments.  It noted Officer Usry's recounting of specific incidents that took place in or near Baby Dolls.  The trial court found Lancaster credible and specifically noted her testimony that she could communicate her message from a distance of eight feet.

We completely endorse the trial court's reasoning, both as to its factual findings and its assessments of the credibility of witnesses, to which we owe deference (
Ward
, 491 U.S. at 802, 105 L. Ed. 2d at 682, 109 S. Ct. at 2759), and its legal conclusions, which we review 
de novo
 (
Weinberg
, 310 F.3d at 1035).  Plaintiffs contend that the trial court applied the wrong standard, citing portions of the trial court's opinion where it stated that it found that the evidence "supports a theory justifying the ordinance."  We do not read this as a simple application of the rational basis test; rather, it seems to us that the trial court was finding that the evidence in fact supported a connection between the harm sought to be controlled and the means chosen to do so (see 
Alameda Books, Inc.
, 535 U.S. at 441, 152 L. Ed. 2d at 684-85, 122 S. Ct. at 1737).  More importantly, we ourselves conclude that the evidence shows that the ordinance serves a substantial government interest.  
City of Renton
, 475 U.S. at 50, 89 L. Ed. 2d at 39, 106 S. Ct. at 930.

Plaintiffs argue that "mere anecdotal recitation of various specific events" occurring at the adult establishments, without a meaningful comparison to other businesses, does not suffice.  First, we note that Eckenstahler did make comparisons to nonadult businesses, including bars and taverns.  Second, although we would agree with plaintiffs if the only evidence available were anecdotal, a legitimate inference that the adult uses cause adverse secondary effects can be drawn from the combination of studies conducted by other units of local government and evidence of particular incidents occurring at local establishments.  The county was entitled to use studies conducted in other localities.  
Pap's A.M.
, 529 U.S. at 297, 146 L. Ed. 2d at 283, 120 S. Ct. at 1395.  These studies support an inference that adult uses cause adverse secondary effects generally.  That there actually were crimes occurring around the adult uses in question in this case indicates that the studies are applicable here.

Plaintiffs contend that Johnson's testimony was completely irrelevant, as he is an expert on land-use planning and his opinions concerned matters of zoning.  Plaintiffs point out that the ordinance has nothing to do with zoning.  The obvious relevance of Johnson's testimony concerns whether a problem exists, rather than solutions for the problem.  Zoning laws are sometimes used to address adverse secondary effects.  See, 
e.g.
, 
Young v. American Mini-Theaters, Inc.
, 427 U.S. 50, 49 L. Ed. 2d 310, 96 S. Ct. 2440 (1976).  However, a unit of local government might choose another way to address problems it faces, such as the ordinance Lake County has enacted.  See 
Pap's A.M.
, 529 U.S. 277, 146 L. Ed. 2d 265, 120 S. Ct. 1382.  That the county chose a manner other than zoning to address the problems it perceived does not mean that Johnson's testimony regarding the existence of a problem is irrelevant.

Plaintiffs also assert that both Dr. Kelly and Eckenstahler "admitted" that the county had no evidence before it when it enacted the ordinance.  Even if this were true, it is not relevant at this stage of the inquiry.  Plaintiffs criticize Eckenstahler's testimony as representing a "subjective view" that there was a high incidence of criminal activity around the adult businesses.  Eckenstahler, however, testified as an expert on the matter of law enforcement.  As such, he was entitled to opine on relevant matters.  Opinions, by their very nature, are subjective.  See Black's Law Dictionary 579 (7th ed. 1999) (defining "opinion evidence" as "[a] witness's belief, thought, or inference about a disputed fact").  Hence, that Eckenstahler's testimony could be characterized as subjective is neither surprising nor problematic.  For the same reason, plaintiffs' reliance on 
R.V.S., L.L.C.
, 361 F.3d at 407, is inapposite.

Plaintiffs rely on 
XLP Corp. v. County of Lake
, 317 Ill. App. 3d 881, 887 (2000), the earlier occasion when this case came before this court following the trial court's erroneous grant of judgment on the pleadings.  In that case, we rejected the county's argument that judgment was proper due to the recitals in the ordinance that indicated that it had relied on outside studies when it enacted the ordinance.  The key difference between that appeal and the present one is that plaintiffs have now had an opportunity to contest the county's assertions at trial.  At this point, we find that the weight of the evidence in the record shows a nexus between the ordinance and the harm it seeks to alleviate.

Likewise, 
Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County
, 337 F.3d 1251, 1272 (11th Cir. 2003), upon which plaintiffs rely, was an appeal following a grant of summary judgment.  In it, the court stated the following:

"[W]e have before us an ordinance adopted only on the basis of speculative findings and outdated, foreign studies whose relevance to local conditions appears questionable in light of current data Appellants have placed in the record suggesting that plaintiffs' businesses, which have operated continuously in Manatee County for over fifteen years, do not cause secondary effects."  
Peek-A-Boo Lounge of Bradenton, Inc.
, 337 F.3d at 1272.

These factors, the court held, created a question of fact and entitled the plaintiffs to proceed past summary judgment.  Here, plaintiffs have already proceeded beyond that point.  After having their day in court, the factual question similar to the one at issue in 
Peek-A-Boo Lounge
 was resolved against them.

In sum, the evidence in the record adequately demonstrates a substantial connection between the ordinance and the secondary effects it is targeted at controlling.  Plaintiffs' experts were undermined by their own acknowledgments regarding their lack of knowledge of prostitution convictions originating from incidents at and near the two establishments.  On the other hand, we find plaintiffs' attempts to undermine the testimony of the county's experts unpersuasive.  We therefore hold that the county has met its burden under 
City of Renton
.

Before closing this section, we note that, though plaintiffs do mention the requirement that a regulation leave open adequate alternative avenues of communication, they make no sustained argument on this point.  Accordingly, we will not consider it.  See 
Northern Trust Co. v. County of Lake
, 353 Ill. App. 3d 268, 273 (2004).

C. The Age Restriction

Plaintiffs' final contention is that the ordinance's age restrictions are unconstitutional.  The ordinance prohibits anyone under the age of 21 to be on the premises, as either an employee or a  patron.  This argument consists of but a single paragraph, wherein plaintiffs simply state that there is no evidence in the record to justify these restrictions.  They cite 
Turner Broadcasting System, Inc. v. Federal Communications Comm'n
, 512 U.S. 622, 129 L. Ed. 2d 497, 114 S. Ct. 2445 (1994).  That case dealt with provisions of a federal statute that required cable television operators to devote a number of channels to local broadcasting.  Its application to this case is not immediately apparent.  Plaintiffs also cite 
Essence, Inc. v. City of Federal Heights
, 285 F.3d 1272 (10th Cir. 2002), which is on point; however, plaintiffs do not discuss the case.  No citations to the record are provided.

We deem this argument waived.  As we have previously stated:

"A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented (134 Ill. 2d R. 341(e)(7)), and it is not a repository into which an appellant may foist the burden of argument and research (
Pecora v. Szabo
 (1982), 109 Ill. App. 3d 824, 825-26); it is neither the function nor the obligation of this court to act as an advocate or search the record for error (
Mielke v. Condell Memorial Hospital
 (1984), 124 Ill. App. 3d 42, 48-49)."  
Obert v. Saville
, 253 Ill. App. 3d 677, 682 (1993).

Plaintiffs' argument raises more questions than it answers.  For example, on its face, this appears to be an equal-protection issue; however, age classifications are not subject to heightened scrutiny.  See 
Massachusetts Board of Retirement v. Murgia
, 427 U.S. 307, 314-17, 49 L. Ed. 2d 520, 525-27, 96 S. Ct. 2562, 2567-69 (1976).  Plaintiffs do not address this seemingly crucial point.

Having found this argument waived, we will not address it further.  We express no opinion on the validity of the age restrictions contained in the ordinance.

III. CONCLUSION

In light of the foregoing, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

HUTCHINSON and CALLUM, JJ., concur.